RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA, AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS AND KHUDAYJA WAITERS, MINORS, BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR., MINORS, BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS-RESPONDENTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS-APPELLANTS.

Argued November 27, 1984—Decided July 23, 1985.

270

272

274

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Marilyn J. Morheuser,* argued the cause for respondents (*Marilyn J. Morheuser,* attorney; *Marilyn J. Morheuser, Ellen S. Bass* and *Flora G. Kimmich,* of counsel and on the brief).

*Peter A. Buchsbaum* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey (*Sterns, Herbert & Weinroth,* attorneys).

*Richard M. Altman* submitted a brief on behalf of *amicus curiae* The American Jewish Committee, the Urban League of Essex County, the League of Women Voters of New Jersey, and the Association for Children on New Jersey (*Pellettieri, Rabstein and Altman,* attorneys; *Anne P. McHugh,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this case, we are asked to consider constitutional challenges to the Public School Education Act of 1975; *L.*1975, *c.* 212; *N.J.S.A.* 18A:7A–1 to –33 (1975 Act). Plaintiffs are children attending public schools in Camden, East Orange, Irvington, and Jersey City.[1] Their consolidated action constitutes a

---

[1] Plaintiffs were certified as a class under Rule 4:32. The class includes all children residing and attending public school in the school districts of Camden,

systemic challenge to the State's plan for funding public school education, which, as applied, allegedly violates the thorough and efficient education clause of the State Constitution, *N.J. Const.* (1947) Art. VIII, § 4, para. 1, and both the State and federal equal protection clauses, *id.*, Art. I, paras. 1, 5; *U.S. Const.* Amend. XIV. These contentions are denied by defendants, the State Commissioner of Education (Commissioner), the State Board of Education (State Board), the State Treasurer, and the State Director of Budget and Accounting.

In September 1983, following extended pretrial discovery proceedings, defendants filed a motion to dismiss the complaint on the grounds that plaintiffs had failed to exhaust administrative remedies. This motion was granted in November 1983. Plaintiffs filed a notice of appeal, and, following our order denying direct certification, the Appellate Division reversed the trial court's decision, remanding the case for a plenary hearing on plaintiffs' constitutional claims. *Abbott v. Burke*, 195 *N.J. Super.* 59 (1984). We granted defendants' ensuing petition for certification. 97 *N.J.* 669 (1984).

■  Despite the reach of the pleadings, this appeal presents only one narrow issue. We must determine the tribunal that shall consider the evidence relevant to the parties' contentions and the facts at the heart of this controversy. The ultimate merits of the constitutional claims and defenses are not before us. The merits, however, cannot be ignored, because the nature and scope of the necessary factual inquiry and legal analysis influence the procedural course that will be taken by this litigation.

The framework for plaintiffs' contention is that under the 1975 Act, for the past decade, the State has contributed no

East Orange, Irvington, and Jersey City. However, as defendants agreed and the trial court ordered, plaintiffs may introduce statewide proofs, including proofs from districts other than plaintiffs'.

more than about 40% of all school operating costs, and that the majority of all public school expenditures is derived from local property taxes. Referring to the considerable evidence marshalled and adduced in the course of discovery, plaintiffs contend that substantial property wealth disparities exist among school districts, that this has resulted in substantial disparities in per pupil expenditures among districts, and that both of these disparities have widened since the 1975 Act went into effect. Allegedly, the absence of financial resources in property-poor school districts, coupled with the availability of much greater resources for children attending school in average and property-rich school districts, deprive plaintiffs of a thorough and efficient education and deny them equal protection of the law.

Defendants concede the existence of great disparities among school districts in terms of moneys expended on public education, but they assert that any educational inequities within plaintiffs' districts are not financial in origin and not attributable to the funding provisions of the 1975 Act. Instead, defendants suggest that plaintiffs suffer, if at all, due in large part to the local school boards' ineffective management of their education systems, and the failure to invoke statutory remedial provisions.

Defendants' contentions led the Chancery Division to dismiss the complaint for plaintiffs' failure to exhaust administrative remedies. In reversing the trial court, the Appellate Division concluded that plaintiffs' challenges required judicial resolution, and that the Superior Court could consider the defense that non-fiscal factors had caused any educational inequities. We reverse this decision, and determine that the parties' claims should initially be presented to an administrative tribunal. But we also recognize the constitutional dimensions of plaintiffs' complaint, and direct the creation of an administrative record sufficient to guide the adjudication of the constitutional issues on any future appeal.

## I.

The State Constitution provides that:

The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this State between the ages of five and eighteen years. [*N.J. Const.* (1947) Art. VIII, § 4, para. 1.]

This provision, known as the "thorough and efficient education clause," became the basis for a profound and sustained legal challenge to the State's system for providing public school education, a challenge mounted more than a decade ago, which continues at present.

In 1970 children attending public schools in property-poor districts brought an action that challenged on constitutional grounds the statutory financing scheme for public elementary and secondary schools. *Robinson v. Cahill,* 118 *N.J.Super.* 223, 227–29 (Law Div.1972) (Botter, J.) (later history omitted). That scheme, initially established by the State School Aid Law, *L.*1954, *c.* 85, was restructured by the Bateman Act, *L.*1970, *c.* 234. *Id.* at 229–30. See *N.J.S.A.* 18A:58–1 to –5.6 (repealed). Under this legislation, the financing of local public school education depended heavily on the financial resources of each local school district, with local taxation furnishing 67% of public school costs. *Id.* at 231. The resulting disparity among the various school districts with respect to their ability to finance educational programs led Judge Botter to declare the statutes unconstitutionally violative of equal protection guarantees. *Id.* at 275.

In 1973 this Court affirmed the trial court's ruling, but on the ground that the State's school funding scheme violated the thorough and efficient education clause of the State Constitution. *Robinson v. Cahill,* 62 *N.J.* 473, 515–19 (1973) (later history omitted) (*Robinson* I). The Court explained that the constitutional guarantee of a thorough and efficient education requires "equal educational opportunity" for all children, *id.* at 513, which "must be understood to embrace that educational opportunity which is needed in the contemporary setting to

equip a child for his [or her] role as a citizen and as a competitor in the labor market," *id.* at 515  The Court further held that if any school district could not provide sufficient educational opportunity, the State must assure the delivery of the constitutionally-required educational programs and facilities. *Id.* at 513, 519–20.

The Court emphasized the "significant connection between the sums expended and the quality of educational opportunity." *Id.* at 481.  It also recognized that equality of financial support did not necessarily yield equal educational opportunity, because both financial and non-financial factors affect educational quality. *Id.; see also infra* at 291–293 (discussing the interplay of financial and non-financial factors).  Nevertheless, the Court in *Robinson* I dealt solely with the financial aspects of the public school funding scheme because the statute itself failed to define the content of a thorough and efficient education and the parties did not show other relevant criteria that could help measure compliance with the State Constitution. *Id.* at 515–16.  In that case, incontrovertible evidence demonstrated that the old funding scheme fostered excessive financial disparities, and thus the Court invalidated the operative statute.

Concluding in *Robinson* I, the Court requested further argument on remedies. *Id.* at 520–21.  In *Robinson v. Cahill,* 63 *N.J.* 196, 197–98 (1973), *cert.* denied *sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973) (*Robinson* II), the unanimous Court agreed that relief must be prospective, and deferred further action until the Legislature had an opportunity to adopt satisfactory legislation.  Later, the Court extended the time for the Legislature to act before the Court would step in and disturb the existing statutory scheme. *Robinson v. Cahill,* 67 *N.J.* 35, 37 (1975) (mem.) (*Robinson* III).

■  Four months later, in the absence of any legislative action, the Court authorized a provisional remedy to effectuate the constitutional entitlement to a thorough and efficient education. *Robinson v. Cahill,* 69 *N.J.* 133, 147–51 (1975) (*Robinson* IV).  The judicial remedy would have required substantial increases in the State's guaranteed minimum levels of available

dollars per pupil. *Id.* at 149–50. Although the Court again acknowledged the importance of non-fiscal factors, it observed that funding was still an "undeniable pragmatic consideration" and that *Robinson* I had dealt with the constitutional problem solely in terms of dollar input per pupil *Id.* at 141 n. 3 The extraordinary action was grounded in the undeniable principle that when legislative inaction threatens to abridge a fundamental right such as education, the judiciary must afford an appropriate remedy: "To find otherwise would be to say that our Constitution embodies rights in a vacuum, existing only on paper." *Id.* at 147 (quoting *Cooper v. Nutley Sun Printing Co.,* 36 *N.J.* 189, 197 (1961)).

Before the judicial measure became effective, however, the Legislature enacted the Public School Education Act of 1975. This Act was promptly tested for *facial* compliance with the thorough and efficient education clause, and, in that context, the Court upheld it as constitutional if fully funded. *Robinson v. Cahill,* 69 *N.J.* 449, 454, 467 (1976) (per curiam) (later history omitted) (*Robinson* V). "Parenthetically," the Court noted "that [the question] whether [the 1975 Act] may or may not pass constitutional muster as applied in the future to any individual school district at any particular time, must quite obviously await the event." *Id.* at 455.

In this case, plaintiffs' constitutional claims, and defendants' defenses, must be understood and related to the antecedent litigation. Plaintiffs' basic assertion is that the 1975 Act has now been funded and, as applied—that is, as funded—it is unconstitutional because the financial disparities among school districts remain excessive; the same infirmity of the school funding scheme, declared unconstitutional in *Robinson* I, has not been overcome, and the State has not heeded the constitutional admonition of *Robinson* V, 69 *N.J.* at 464–65, concerning the need for an empirical demonstration of adequate funding under the 1975 Act. Defendants, on the other hand, hearken to *Robinson* I's observation, reiterated in *Robinson* V, 69 *N.J.* at 455–56, that a thorough and efficient education entails, in addition to adequate funding, standards defining a thorough

and efficient education and effective regulatory means to assure that such an education is furnished throughout the state; these standards exist, and defendants contend that a constitutional attack upon the funding provisions of the 1975 Act cannot fully be addressed without a concomitant examination of whether the statutory and regulatory scheme suffices to cure any discovered educational inequities in particular school districts. We must therefore examine the provisions of the 1975 Act and the parties' respective factual contentions regarding these provisions as applied.

## II.

The 1975 Act defines the goal of a thorough and efficient educational system: "free public schools shall * * * provide to all children in New Jersey, regardless of socioeconomic status or geographic location, the educational opportunity which will prepare them to function politically, economically and socially in a democratic society." *N.J.S.A.* 18A:7A–4. The Legislature specifically acknowledged the major elements of the State's obligations, as follows:

a. Establishment of educational goals at both the State and local levels;

b. Encouragement of public involvement in the establishment of educational goals;

c. Instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills;

d. A breadth of program offerings designed to develop the individual talents and abilities of pupils;

e. Programs and supportive services for all pupils especially those who are educationally disadvantaged or who have special educational needs;

f. Adequately equipped, sanitary and secure physical facilities and adequate materials and supplies;

g. Qualified instructional and other personnel;

h. Efficient administrative procedures;

i. An adequate State program of research and development; and

j. Evaluation and monitoring programs at both the State and local levels. [*N.J.S.A.* 18A:7A–5]

This definition of a thorough and efficient education satisfies the constitutional requirement for legislative standards, assuming "the requisite of sufficient fiscal support." *Robinson* V, 69 *N.J.* at 457. The question remains whether the operative terms

of the 1975 Act in fact assure that all the state's children receive their due.

Plaintiffs invoke the standards in *N.J.S.A.* 18A:7A–5 to identify areas of educational inequality among school districts. Their own districts allegedly suffer particular deficiencies with respect to the adequacy of instruction, the breadth of program offerings, the adequacy of programs and services for children with special educational needs, the quality of physical facilities and materials and supplies, the qualifications of school personnel, the effectiveness of administration, and the adequacy of evaluation and monitoring programs. See *N.J.S.A.* 18A:7A–5(c–h and j). Plaintiffs intend to demonstrate these deficiencies by a comparison among school districts, focusing on certain aspects of public school education including: levels of academic achievement, numbers and qualifications of teaching and administrative personnel; quantity and quality of facilities, materials, and supplies; availability of special services for students with special needs; variety of programs for the typical student; and consistency of state supervision. By these comparisons, plaintiffs offer to prove that children in the property-poorest school districts receive a constitutionally-inadequate education.

■ Plaintiffs plan to include references to the State Board's own records to show that children in property-poor school districts learn significantly less than children in other school districts. For example, they propose to document differing achievement levels by reference to the results of certain standardized tests. Plaintiffs also offer evidence of a disproportionally large dropout rate among students in their urban districts, which contributes to reduce net educational achievement. These and other "output" measures of educational success clearly bear on plaintiffs' constitutional claim.

Relatively low levels of educational success may be caused by inadequate access to human and capital resources necessary for a well-run school. Plaintiffs claim, for example, that property-rich school districts provide better educations because higher salaries lure more qualified teachers and because higher budg-

ets allow fewer pupils per teacher or administrator. Plaintiffs also seek to document the extensive deterioration of the physical plant in their urban schools, and claim that their districts have relatively higher operating costs due, for example, to the need for maintenance, treatment of asbestos surfaces, and heating of their older, less energy-efficient facilities. Thus, educational "inputs" will also be considered in assessing plaintiffs' constitutional claims.

Plaintiffs develop an additional position based on the State's obligation to provide sufficient resources for children with special needs, including physically and psychologically handicapped youngsters. They stress that property-poor districts include disproportionate numbers of children with the greatest educational needs; many families in such school districts are non-English speaking, with low incomes, low educational attainment, and high unemployment, all of which compound the difficulties in achieving a sound education for the children. Plaintiffs contend that the present amount of categorical aid provided by the State does not provide sufficient funding for the programs that these children need.

According to plaintiffs, all of these educational deficiencies could substantially be ameliorated *only* by increasing their entitlement to state aid. "[A]dequate financial resources" are, in theory, guaranteed to all districts by the 1975 Act. *N.J.S.A.* 18A:7A–2 b(4). However, based in part on the Legislature's finding that local funding is important to encourage local involvement in public education, *N.J.S.A.* 18A:7A–2 a(7), the 1975 Act continues to require a substantial amount of local fundraising for general educational operations, and uses state aid for only limited purposes. *See supra* at 278 (State has contributed only 40% of the total cost of education since 1975; local property taxes pay for over 50%). Plaintiffs allege that these limited purposes ensure that serious educational inequities will remain inadequately addressed by the 1975 Act.

In general, the state allocates financial aid for education through various funding formulas. Some of this aid is distributed to school districts based solely on the characteristics of

their students, without regard to the school districts' per-pupil property wealth. *See, e.g., N.J.S.A.* 18A:7A–20 (funds made available for special education programs depending on the number of children with identified handicaps); *N.J.S.A.* 18A:58–7 (transportation aid given for all students living a sufficiently great distance from school); *N.J.S.A.* 18A:46–23 (transportation aid for handicapped students allocated similarly). Some state aid is linked to local district spending, so that districts with greater budgets received greater aid. *See, e.g., N.J.S.A.* 18A:66–1 to –192 (State pays employers' contribution to the Teachers' Pension and Annuity Fund, which payments, being dependent on the number of teachers hired and their salaries, flow disproportionately to those districts spending more per pupil dollars on personnel). Most state aid, however, is distributed according to formulas governing equalization aid, see *N.J.S.A.* 18A:7A–18, and aid for debt service and capital outlays, see *N.J.S.A.* 18A:7A–19, and this aid is distributed so that property-poor districts receive more aid than property-rich districts. Various of these funding formulas were discussed in *Robinson* V, and candor compels the recognition that all members of the Court raised serious questions about the probability that these formulas would operate in a constitutionally effective manner, although the majority of the Court expressed the willingness to wait and see how the system operated in fact. *See* 69 *N.J.* at 463–68 (per curiam); *id.* at 468–75 (Hughes, C.J., concurring); *id.* at 476–512 (Conford, P.J.A.D., t/a, concurring and dissenting); *id.* at 512–62 (Pashman, J., dissenting); *see also Abbott,* 195 *N.J.Super.* at 65–68 (describing the operation of the equalization aid formula).

The application of these formulas now constitutes the focal point of plaintiffs' constitutional challenge. In theory, they argue, it is wrong that state aid does not flow to districts based solely on actual need. In practice, plaintiffs claim, the funding formula of the 1975 Act has *increased* the disparity among school districts in available dollars per pupil, and thus *increased* educational inequalities between property-rich districts and property-poor districts. *See Abbott,* 195 *N.J.Super.* at

68–71 (summarizing some of plaintiffs' evidence).[2]  Because educational opportunity closely tracks district property wealth under the 1975 Act as applied, plaintiffs expect to prove that the funding provisions themselves are unconstitutional.

Defendants propose a two-pronged defense to the claim that the 1975 Act raises an intolerable barrier to progress in plain-

[2]For example, plaintiffs' pleadings refer to evidence from the following study.  First, plaintiffs ranked all school districts from property-richest to property-poorest, and then this list was broken into seven sets of districts containing roughly equal numbers of students, so that the property-richest districts were grouped together, the second heptile of property-richest districts were grouped together, and so on, so that the seventh set contained only the property-poorest set of school districts.  Second, for each set of districts plaintiffs calculated total "current expenditures," which is one measure of how much money a school district spends.  Third, for each set of districts plaintiffs totaled up the number of "weighted pupils," a number that uses legislatively-established figures to reflect the fact that districts containing more students with special educational needs should be treated as if they had more children to educate.  Finally, for both the 1975 and 1979 school years, for each set of districts, plaintiffs divided total current expenditures by total weighted pupils, to generate a measure of average current expenditure per weighted pupil. They report the following results.

| District Wealth Groups | Average Current Expenditure/ Weighted Pupil | |
|---|---|---|
| | 1975-76 | 1979-80 |
| Group 1 | $1681 | $ 2529 |
| Group 2 | 1628 | 2399 |
| Group 6 | 1324 | 1920 |
| Group 7 | 1372 | 1924 |
| State Average | 1472 | 2162 |
| Range, Group 1 to Group 7 | $ 309 | $ 605 |

Plaintiffs' further analysis of the data suggests that in 1975–76 the average expenditure per weighted pupil in the poorest student group was 93.2% of the state average, whereas by 1979–80 it had *dropped* to 89.0% of the state average; the plaintiffs also claim that, while in 1975–76 the average expenditures per weighted pupil in the wealthiest districts was 114% of the state average, it had *increased* to 117% of the state average by 1979–80.

tiffs' school systems. Their primary theory is "that educational achievement is effected almost entirely by factors not primarily financial in character," and thus defendants deny the relevance of plaintiffs' attack on the funding provisions. Further, the State claims that plaintiffs' school districts have access to more than enough financial resources to avoid any adverse impact on educational quality.

Defendants have offered to prove that three sets of "educationally productive factors" most significantly affect academic learning: (1) the age, ability, and motivation of students, (2) the amount and quality of instruction, and (3) the nature of home and school environmental influences. The factors are, allegedly, distinguishable from those factors that substantially determine total educational expenses, such as teacher salary and class sizes. Thus, defendants suggest that any existing educational deficiencies in plaintiffs' school districts could be sufficiently ameliorated by taking advantage of the Commissioner's expertise in restructuring the way funds are spent.

Defendants emphasize this additional point where they allege in affirmative defenses that numerous failures of local administrators in plaintiffs' school districts caused any existing inequalities in educational opportunity. They plan to present evidence pertaining to, for example, the sufficiency of the breadth of curricula offerings chosen, the selection of instructional personnel, the training of teachers, the appropriate provision of bilingual education, and the procedures for identifying handicapped children in need of special education. Management decisions relating to these educational elements may be improved, allegedly with significant results, by employing the Commissioner's and State Board's expertise and powers under *N.J.S.A.* 18A:7A–14, 15, and 16.

Specifically, defendants identify a six-point program that they would employ to eliminate any inequities in plaintiffs' school districts. The program promotes strong instructional leadership, a school climate that is safe and orderly and rewards

achievement, classroom practices that enhance student atten-
tion, alignment of curricular objectives and instruction, assess-
ment and evaluation of teachers and students focusing on
student achievement, and parent and community involvement in
the educational process. This program allegedly grows out of
the Commissioner's experience in managing the Trenton public
schools. See *In re Trenton Board of Education*, 86 *N.J.* 327
(1981) (granting the Commissioner authority to administer the
Trenton public school system).

To the extent that these and other remedial programs cost
money, defendants claim that plaintiffs' school districts have
enough money available. For example, defendants offer to
prove that plaintiffs' school districts have been running signifi-
cant budget surpluses in recent years. Further, defendants
note that if the existing budgets in plaintiffs' school districts do
not suffice to implement any necessary new programs, the
Commissioner and State Board retain authority to force school
districts to raise taxes so as to generate more revenues. *See
Robinson* V, 69 *N.J.* at 461–62.

Plaintiffs counter defendants' contentions by asserting that
improvements based on so-called non-fiscal factors, including
the six-point urban schools plan, will cost their school districts
more money than is presently available. Further, plaintiffs
plan to document their school districts' inability to raise taxes
still higher, and allege that their districts not only have greater
school tax rates than the wealthier districts, but also that their
districts' total property tax rates exceed those in wealthier
districts. Plaintiffs thus claim to suffer from municipal over-
burden, with a coincidence of high tax rates imposed on proper-
ty of limited value.

Defendants acknowledge that plaintiffs' school districts will
never be able to raise the same sums per pupil that property-
rich districts may obtain. Assuming that the disparities in
available financial resources do not create violations of the
thorough and efficient education clause, defendants suggest

that neither do these disparities create violations of the State Constitution's equal protection clause, because the State's interest in assuring the associational right to settle in communities that offer different quantities and qualities of education is sufficient to justify retaining the present level of local control over school funding. By contrast, even assuming that the 1975 Act as applied does not violate the thorough and efficient education clause, plaintiffs contend that the state has no need to delegate so much control over funding to local school districts, and further contends that under the equal protection clause, the paramount importance of education to children requires a greater degree of equality in distribution of financial resources for education across New Jersey.

## III.

We cannot in this case undertake to resolve the constitutional claims and defenses of the parties. Nevertheless, the constitutional issues must be gauged in light of the facts that the parties are prepared to marshall.

## A.

In evaluating whether the 1975 Act, as applied, satisfies the State's constitutional obligation under the thorough and efficient education clause, the Court recognizes the paramount requirement that at all times the State secures "the common [educational] rights of all." *Robinson* I, 62 *N.J.* at 515 (citing *Landis v. Ashworth (School District No. 44)*, 57 *N.J.L.* 509 (Sup.Ct.1895)). In *Landis,* because "secondary schooling as we know it today was not generally available," such learning was found not essential for a thorough and efficient education. *Id.* "Today, a system of public education which did not offer high school education would hardly be [constitutional]." *Id.* Appropriately, in the 1975 Act the Legislature established that "the sufficiency of education is a growing and evolving concept * * [and] depend[s] upon the economic, historical, social and cultur-

al context in which that education is delivered." *N.J.S.A.* 18A:7A–2 a(4). This "perspective recognition * * * manifests an awareness that what seems sufficient today may be proved inadequate tomorrow, and even more importantly that only in the light of experience can one ever come to know whether a particular program is achieving the desired end." *Robinson* V, 69 *N.J.* at 457–58.

▉▉ This evolving standard will influence judicial evaluation of documented differences in either educational achievement or program offerings. If, for example, significant numbers of students in plaintiffs' school districts fail to receive an effective secondary education by reason of the 1975 Act's operation, then the Act fails to provide equal educational opportunity. *Robinson* I, 62 *N.J.* at 515. Similarly, the 1975 Act may fail to provide equal educational opportunity by allowing equivalently-qualified students to attend schools providing significantly disparate program offerings. *See Robinson* V, 69 *N.J.* at 459–60; *see also id.* at 465 (disparities in tax bases may show inadequate available resources).

▉▉ The thorough and efficient education clause, however, does not require "the legislature to provide the same means of instruction for every child in the state." *Landis,* 57 *N.J.L.* at 512 (quoted in *Robinson* I, 62 *N.J.* at 514). The configuration of educational services "that will produce a sufficiently fine educational opportunity in one district, will inevitably be different from that required in others." *Robinson* V, 69 *N.J.* at 459. Thus, Chief Justice Weintraub appropriately concluded in *Robinson* I, consistent with the thorough and efficient education clause, "if the State assumes the cost of providing the constitutionality mandated education, it may * * * authorize local government to go further and to tax to that end, provided that such authorization does not become a device for diluting the State's mandated responsibility." 62 *N.J.* at 520.

▉ In evaluating whether the 1975 Act satisfies the State's responsibility, a measure of local educational expenditures in

terms of "dollar input per pupil * * * is plainly relevant." *Id.* at 515. Dollars pay for current operating expenses and capital expenditures, and judicial notice has been taken that differences in area costs as well as qualities of students may result in different levels of spending required to achieve the same educational opportunity in different districts. *Id.* at 520. Further, in some cases for disadvantaged students to receive a thorough and efficient education, the students will require above-average access to education resources. *See Robinson* IV, 69 *N.J.* at 141; *see also N.J.S.A.* 18A:7A–20 (additional aid provided for children with special needs). These factors all bear on the amount of money that a school district must be able to provide for its children.

This Court has recognized that "[f]iscal inability on the part of a local district [to provide a thorough and efficient education] may conceivably stem from one or more of several causes." *Robinson* V, 69 *N.J.* at 465. These causes include "lack of an adequate tax base for educational purposes as indicated by the gross disparities shown in per pupil tax resources," municipal overburden, and use of minimum aid provisions that divert to wealthy school districts the funds needed in poor districts. *Id.* at 465–67. In this context, plaintiffs' empirical evidence supporting the claim that their school districts "lack * * * an adequate tax base for educational purposes" is probative on the issue that financial disparity may render the 1975 Act unconstitutional as applied. *See Robinson* V, 69 *N.J.* at 457 (state must provide "sufficient fiscal support").

Nevertheless, the Court has "been constantly mindful that money is only one of a number of elements that must be studied in giving definition and content to the constitutional promise of a thorough and efficient education." *Robinson* V, 69 *N.J.* at 455. In *Robinson* IV, 69 *N.J.* at 141 n. 3, Chief Justice Hughes affirmed that

a multitude of [non-fiscal] factors play a vital role in the educational result—to name a few, individual and group disadvantages, use of compensatory tech-

niques for the disadvantaged and handicapped, variation in availability of qualified teachers in different areas, effectiveness in teaching methods and evaluation thereof, professionalism at every level of the system, meaningful curricula, exercise of authority and discipline, and adequacy of overall goals fixed at the policy level.

The Court favored the 1975 Act in *Robinson* V because the legislation incorporated all of these factors in a complete educational plan. 69 *N.J.* at 455, 463. In particular, this legislation "at once seeks to define the constitutional promise [of a thorough and efficient education], identify the components of which it consists, establish a procedural mechanism for its implementation and afford the financial means necessary for its fulfillment." *Id.* at 456. See *N.J.S.A.* 18A:7A–4, 5, 14–16, 17–31. Thus, in considering plaintiffs' claim under the thorough and efficient education clause, the Court's analysis of the 1975 Act's financial provisions as applied cannot be separated from its analysis of the statute's educational goals, components, and procedural processes.

In this last regard, particular attention should be accorded to claims regarding the existence of irremediable municipal overburden. In *Robinson* V, 69 *N.J.* at 466, the Court expressed concern that the 1975 Act failed to specify "where the money is to come from in the event of a showing that a local school district is performing inadequately due to a fiscal insufficiency, together with a further showing of inability at the local level to make up this monetary lack." The Court expressly requested "guidelines—legislative or administrative—as to what kind of showing must be made by a school district asking for state assistance due to local inability to recruit needed funds." *Id.* Insofar as plaintiffs allege that their school districts suffer from municipal overburden, the parties should directly address the question of how to determine when a taxing district cannot be required to increase its taxes to fund public schools.

B.

In addition to their claims under the thorough and efficient education clause, plaintiffs allege that the 1975 Act, as applied,

violates the State Constitution's guarantees of equal protection. See *N.J. Const.* (1947), Art. I, paras. 1, 5.[3] An analogous claim was considered in *Robinson* I, 62 *N.J.* at 490–501, where Chief Justice Weintraub recognized the doctrine's potential impact on public school financing, but declined to determine the precise effect of the Constitutional mandate. He concluded that the "equal protection proposition potentially implicates the basic tenent of local government that there be local authority with concomitant fiscal responsibility." *Id.* at 499–500. This issue could be avoided in that case given the availability of an alternative ground for decision, but the Chief Justice's opinion highlights the need in this case for a well-developed record regarding the application of equal protection principles to effectuate educational rights.

In *Robinson* I, the Chief Justice also laid the groundwork for the modern analysis of equal protection under the State Constitution. He recognized that

[m]echanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. [*Id.* at 491–92]

These principles led the Court to reject the federal equal protection analysis for cases involving fundamental rights. *Borough of Collingswood v. Ringgold,* 66 *N.J.* 350, 370 (1975), appeal dismissed, 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.*2d 826 (1976). See *Greenberg v. Kimmelman,* 99 *N.J.* 552, 562.

---

[3]In their brief, plaintiffs also assert that the 1975 Act, as applied, violates federal equal protection norms. Plaintiffs in *Robinson* I similarly invoked the federal Constitution in challenging what they alleged to be an impermissible wealth-based classification and an impairment of their fundamental right to education. This claim was rejected. 62 *N.J.* at 486–90 (citing *San Antonio Independent School Dist. v. Rodriguez,* 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.*2d 16 (1973)). *But cf. Plyler v. Doe,* 457 *U.S.* 202, 102 *S.Ct.* 2382, 72 *L.Ed.*2d 786 (1982).

(1985) (discussing the two-tier and three-tier federal approaches). Under the New Jersey Constitution, a balancing test is employed to determine whether a claimed deprivation of personal rights violates Article I of the State Constitution. *Id.* at 567.

In striking the balance, a court must consider "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Id.* (citing *Right to Choose v. Byrne*, 91 *N.J.* 287, 308–09 (1982); *Robinson* I, 62 *N.J.* at 491–92). The label of a right as "fundamental" takes on no talismanic significance, see *Right to Choose*, 91 *N.J.* at 308, the point simply being that "where an important personal right is affected by government action, the Court often requires the public authority to demonstrate a greater 'public need' than is traditionally required in construing the federal constitution." *Taxpayers Ass'n of Weymouth Township, Inc. v. Weymouth Township*, 80 *N.J.* 6, 43 (1976).

The common experience that the education of each child is vitally important, both to the child individually and to society as a whole, is recognized throughout the country. *Levine v. State Department of Institutions and Agencies*, 84 *N.J.* 234, 244–48, 258 (1980); *see, e.g., Plyler v. Doe*, 457 *U.S.* 202, 221–24, 102 *S.Ct.* 2382, 2396–98, 72 *L.Ed.*2d 786, 801–03 (1982); *Seattle School District No. 1 v. State*, 90 *Wash.*2d 476, 585 *P.*2d 71, 90 (1978); *Washakie County School District No. 1 v. Herschler*, 606 *P.*2d 310 (Wyo.1980), *cert.* denied, 449 *U.S.* 824, 101 *S.Ct.* 86, 66 *L.Ed.*2d 28 (1980); *Horton v. Meskill*, 172 *Conn.* 615, 376 *A.*2d 359 (1977) (later history omitted); *Serrano v. Priest*, 18 *Cal.*3d 728, 557 *P.*2d 929, 135 *Cal.Rptr.* 345 (1976), *cert.* denied, 432 *U.S.* 907, 97 *S.Ct.* 2951, 53 *L.Ed.*2d 1079 (1977); *Pauley v. Kelly*, 162 *W.Va.* 672, 255 *S.E.*2d 859 (1979) (later history omitted).

Thus, in litigating the equal protection claim, it is anticipated that the parties will address issues that will overlap

substantially with the questions raised by the claim based on the thorough and efficient clause. Both turn on proof that plaintiffs suffer educational inequities and that these inequities derive, in significant part, from the funding provisions of the 1975 Act. The claims may differ, however, in that the thorough and efficient education issues call for proofs that, after comparing the education received by children in property-poor districts to that offered in property-rich districts, it appears that the disadvantaged children will not be able to compete in, and contribute to, the society entered by the relatively advantaged children. The equal protection issues, on the other hand, call for proofs that, even if all children receive a minimally thorough and efficient education, the financing scheme engenders more inequality than is required by any other State interest.[4] Thus, the previously discussed factual issues of actual educational achievement, the achievement's connection to school funding, the funding's connection to property taxes, the taxes' connection to local government autonomy, and the autonomy's importance all bear on this constitutional litigation.

## IV.

Given the confluence of complex legal and factual issues in this case, we must decide whether the controversy, in the first instance, can and should be resolved in whole or in part before an administrative tribunal, or whether it must immediately be considered by the judiciary. In general, available and appropriate "administrative remedies should be fully explored before judicial action is sanctioned." *Garrow v. Elizabeth General Hospital and Dispensary*, 79 *N.J.* 549, 558 (1979); *see Board of Education of East Brunswick Township v. Township Council of East Brunswick*, 48 *N.J.* 94, 102 (1966). The

---

[4]Plaintiffs have also alleged that the 1975 Act effects discrimination based on race and national origin: as Chief Justice Weintraub explained, "if a discrimination of that kind is found, the inquiry may well end, for it is not likely that a State interest could sustain such a discrimination." *Robinson* I, 62 *N.J.* at 491.

State argues for such a requirement because the litigation focuses on subjects that are particularly amenable to specialized consideration and clearly related to areas of administrative regulatory concern. Plaintiffs, however, assert that a constitutional issue invokes solely the jurisdiction of the courts and that an administrative proceeding will deny them the opportunity to make a timely presentation and secure final resolution of their constitutional contentions. All litigants agree that the procedural *desideratum* in this case is the rapid, thorough, complete, and impartial determination of all the relevant issues that have been properly and fairly presented. Toward this end, we are satisfied that the presence of constitutional issues and claims for ultimate constitutional relief does not, in the context of this litigation, preclude resort in the first instance to administrative adjudication.

### A.

We note that the preference for exhaustion of administrative remedies is one "of convenience, not an indispensable pre-condition." *Swede v. City of Clifton,* 22 *N.J.* 303, 315 (1956). Thus, except in those cases where the legislature vests exclusive primary jurisdiction in an agency, a plaintiff may seek relief in our trial courts. *Borough of Matawan v. Monmouth County Board of Taxation,* 51 *N.J.* 291, 296 (1968) (administrative exhaustion not an absolute jurisdictional requirement). In any case amenable to administrative review, however, upon a defendant's timely petition, the trial court should consider whether exhaustion of remedies will serve the interests of justice.

The interests that may be furthered by an exhaustion requirement were identified in *City of Atlantic City v. Laezza,* 80 *N.J.* 255, 265 (1979):

> (1) the rule ensures that claims will be heard, as a preliminary matter, by a body possessing expertise in the area; (2) administrative exhaustion allows the parties to create a factual record necessary for meaningful appellate review;

and (3) the agency decision may satisfy the parties and thus obviate resort to the courts.

However, as explained in *Garrow,* 79 *N.J.* at 561,

[t]he exhaustion doctrine is not an absolute. Exceptions exist when only a question of law need be resolved, *Nolan v. Fitzpatrick,* 9 *N.J.* 477, 487 (1952); when the administrative remedies would be futile, *Naylor v. Harkins,* 11 *N.J.* 435, 444 (1953); when irreparable harm would result, *Roadway.Express, Inc. v. Kingsley,* 37 *N.J.* 136, 142 (1962); when jurisdiction of the agency is doubtful, *Ward v. Keenan,* 3 *N.J.* 298, 308–309 (1949); or when an overriding public interest calls for a prompt judicial decision, *Baldwin Const. Co. v. Essex Cty. Bd. of Taxation,* 24 *N.J.Super.* 252, 274 (Law Div.1952), aff'd 27 *N.J.Super.* 240 (App.Div.1953). The assertion of a constitutional right may be one factor to be considered in determining whether judicial intervention is justified—but it is only one of many relevant considerations. * * * *Brunetti v. Borough of New Milford,* 68 *N.J.* 576 [, 590–91] (1975).

*Accord New Jersey Civil Service Ass'n v. State,* 88 *N.J.* 605, 613 (1982). Clearly, there will be cases, as here, where the considerations that are relevant to the exhaustion requirement are in near-equipoise, and the court must weigh them carefully to find the proper balance. *See Hinfey v. Matawan Regional Board of Education,* 77 *N.J.* 514, 532 (1978); *Roadway Express,* 37 *N.J.* at 141; *see generally K. Davis,* 4 *Administrative Law Treatise* § 26:1 (1983) ("The Exhaustion Problem").

■■■■■ In general, in cases "involving only legal questions, the doctrine of exhaustion of remedies does not apply." *New Jersey Civil Service Ass'n,* 88 *N.J.* at 613 (citing *Farmingdale Realty Co. v. Borough of Farmingdale,* 55 *N.J.* 103, 112 (1969); *Borough of Matawan,* 51 *N.J.* at 296). A limited exception to this rule may be appropriate where the court perceives the agency to be in a special position to interpret its enabling legislation, *see Paterson Redevelopment Agency v. Schulman,* 78 *N.J.* 378, 387 (1979), *cert.* denied 444 *U.S.* 900, 100 *S.Ct.* 210, 62 *L.Ed.*2d 136 (1979); but where the agency cannot definitively or conclusively resolve the issues, and further, cannot provide any relief for plaintiffs, any delay in confronting the merits will work an injustice, *Boss v. Rockland Electric Co.,* 95 *N.J.* 33, 40 (1983). Such concerns attain paramount importance in litigation to resolve purely constitutional claims, *Borough of Matawan,* 51 *N.J.* at 297, for although an agency may base its

decision on constitutional considerations, such legal determinations do not receive even a presumption of correctness on appellate review. *Hunterdon Central High School Board of Education v. Hunterdon Central High School Teachers' Ass'n,* 174 *N.J.Super.* 468, 475 (App.Div.1980), aff'd o.b. 86 *N.J.* 43 (1981); *see generally K. Davis, supra,* § 26:6 (1983) ("When May a Statute's Constitutionality Be Challenged Without Exhausting Administrative Remedies"). Thus, facial constitutional challenges to statutes should be judicially resolved, even where an as-applied challenge to a statute may strongly suggest initial agency adjudication. *Brunetti,* 68 *N.J.* at 588, 591.

■■■ By contrast, "a proper reason for requiring exhaustion before a court passes upon [the] constitutionality of a statute is that the court may need a factual development which will help it to resolve the constitutional issue." *K. Davis, supra,* § 26:6, at 436. Based on this principle, the Court has at times required plaintiffs to exhaust their administrative remedies notwithstanding their allegations of a statute's constitutional deficiencies. *E.g., Paterson Redevelopment Agency,* 78 *N.J.* at 386–88; *Brunetti,* 68 *N.J.* at 590–91; *Mutual Home Dealers Corp. v. Commissioner of Banking and Insurance,* 104 *N.J.Super.* 25, 31 (Ch.Div.1968), aff'd o.b., 55 *N.J.* 82 (1969); *Roadway Express,* 37 *N.J.* at 140. Similarly, in previous education cases raising or implicating constitutional issues, this Court has called for exhaustion of administrative remedies when this will serve to develop a fully informed factual record and maximize the soundness of determinations through the agency's expertise. *See, e.g., Board of Education, East Brunswick Township,* 48 *N.J.* at 101–05 (citing *Town Council of Montclair v. Baxter,* 76 *N.J.L.* 68 (Sup.Ct.1908); *Ridgway v. Upper Freehold Board of Education,* 88 *N.J.L.* 530 (Sup.Ct.

1916), and distinguishing cases where no administrative expertise was implicated).[5]

### B.

It is apparent that the myriad, extraordinary, and complex factual issues presented in this case will cause the litigation to turn on the import of proofs that demand close and considered examination and evaluation. In particular, in the far-ranging context of the claims and defenses, the issues of educational quality and municipal finance may be more effectively presented, comprehended, and assessed by a tribunal with the particular training, acquired expertise, actual experience, and direct regulatory responsibility in these fields. For these reasons, the Court has repeatedly acknowledged and approved the administrative handling of educational controversies that arise in the context of constitutional and statutory litigation, including evaluation of local educational problems, design of remedial measures, and supervision of the program implementation. *E.g., In re Trenton Board of Education,* 86 *N.J.* 327 (1981) (concerning operation of classroom programs, revenue raising and budgeting, and affirmative action); *In re Upper Freehold Regional School District,* 86 *N.J.* 265 (1981) (concerning physical plant and revenue raising); *Hinfey,* 77 *N.J.* 514 (1978) (concerning discrimination in academic courses of study and curriculum); *Dunellen Board of Education v. Dunellen Education Ass'n,* 64 *N.J.* 17 (1973) (concerning school administration); *Jenkins v.*

---

[5]The doctrine of administrative exhaustion serves purposes similar to the doctrine of primary jurisdiction. *Boss,* 95 *N.J.* at 40. "Primary jurisdiction is a doctrine of common law, wholly court-made, that is designed to guide a court in determining whether and when it should refrain from or postpone the exercise of its own jurisdiction so that an agency may first answer some questions presented." *K. Davis, supra,* § 22.1, at 81. When an agency and a court have concurrent jurisdiction to evaluate certain elements underlying a particular claim, the court may refrain from the "initial performance of tasks that the legislative body has assigned to the agency." *Id.* at 82. Thus, on occasion this Court has called for a trial court to submit particular questions of fact to a qualified agency. *E.g., Boss,* 95 *N.J.* at 40–42.

*Morris Township School District*, 58 *N.J.* 483 (1971) (concerning integration).

Thus, when a controversy arises in the field of education, the cases tend to determine remedies by a procedural course set by *N.J.S.A.* 18A:6–9. *See, e.g., Hinfey*, 77 *N.J.* at 525. That statute grants the Commissioner plenary authority "to hear and determine * * * all controversies and disputes arising under the school laws * * *." The school laws include the Public School Education Act of 1975, and, as the preceding discussion makes clear, a controversy now awaits resolution.

■ We therefore conclude that this case can and should be considered in the first instance by the appropriate administrative agency. This action is proper because the ultimate constitutional issues are especially fact-sensitive and relate primarily to areas of educational specialization. Accordingly, the matter is to be remanded and transferred to the Commissioner of Education. Under the circumstances, we do not deem it necessary to dismiss the complaint. *Cf. Kaczmarek v. New Jersey Turnpike Authority*, 77 *N.J.* 329 (1978) (complaint filed in the Superior Court could be transferred to appropriate administrative agency). This will expedite the litigation by enabling the parties to rely on their existing pleadings, as well as on other relevant matters of record that have been developed in the course of the judicial proceedings.

■ As noted, defendants disclaim the existence of substantial educational deficiencies in plaintiffs' school districts and, further, deny that any such deficiencies that might arise are due to the 1975 Act's fiscal provisions; simultaneously, defendants maintain that *N.J.S.A.* 18A:7A–14 to –16 empower them to ameliorate whatever deficiencies might be discovered. Thus, defendants may be deemed to have joined issue with plaintiffs on the key points in this case and, in the sense of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to 15, the matter clearly "is contested." *N.J.A.C.* 1:1–5.1(a); *N.J.A.C.*

1:1–1.6. As a contested matter, this case shall be transferred by the Commissioner under *N.J.A.C.* 1:1–5.1 to be heard by the Office of Administrative Law (OAL).[6]

The OAL employs administrative law judges, who are carefully chosen and trained to provide informed and impartial consideration of the administrative matters before them. These offices were created in 1978, when the Legislature reorganized the administrative system under *N.J.S.A.* 52:14F–1 to –11, a statute previously commended by this Court.

> The salutary purpose of the statute "is to improve the quality of justice with respect to administrative hearings ...[,] to eliminate conflict of interests for hearing officers, promote due process, expedite the just conclusion of contested cases and generally improve the quality of administrative justice." *Statement of Purpose*, L. 1978, c. 67. The administrative law judges will be independent of the administrative agency whose jurisdiction is involved. The judge assigned to a contested case presumably will have the expertise, knowledge, training and background to qualify him or her to preside over the particular case. *N.J.S.A.* 52:14F–6. When, as in the present case, there are involved multiple issues implicating different administrative disciplines or domains, the statute contemplates the designation of an individual administrative law judge, or another "who may be specially appointed," with the special qualifications commensurate with the demands of the case itself. *N.J.S.A.* 52:14F–5 m, –6. [*City of Hackensack v. Winner*, 82 *N.J.* 1, 36–37 (1980) (footnote omitted)]

The OAL's obligation and capacity to designate specially qualified judges cannot be overemphasized in the present context. This litigation exemplifies the type of complex, sensitive, important, multi-issue, and cross-disciplinary matter that the Legislature contemplated in authorizing the selection of persons to

---

[6]The OAL rules provide, in some cases, for an agency head to postpone transfer of a contested matter while the parties negotiate. *N.J.A.C.* 1:1–5.1(b). However, no such delay is allowed where it would be inappropriate or unproductive. *N.J.A.C.* 1:1–5.4. In this case, given that the parties have had almost five years to reach an accommodation, there can be no justification for the Commissioner to postpone a reference to the OAL. Further, although in some cases the Commissioner may retain the matter in order to act as the presiding official, *N.J.S.A.* 52:14F–8(b), where, as here, the Commissioner and the State Board are defendants, it would constitute an abuse of discretion for the Commissioner not to transfer this case. *See R.* 1:12–1(f).

serve as administrative law judges both from within and without state government. *See N.J.S.A.* 52:14F–6 b.

Thus, remand to the administrative agency is particularly appropriate in this case. We anticipate that the OAL will conduct a thorough hearing, where the parties shall present all their evidence relevant to the constitutional claims and defenses. This will serve to consolidate all fact-findings in a single proceeding. We intend that the proceedings will promote development of a complete and informed record, which will reflect determinations of appropriate administrative issues as well as the resolution of factual matters material to the ultimate constitutional issues.

Finally, we are confident that all proceedings before the administrative agencies—the OAL, the Commissioner, see *N.J.S.A.* 52:14B–10(c), and the State Board, see *N.J.S.A.* 18A:6–27—can and will be expedited. This remand shall not be construed to postpone adjudication at the administrative level in order for the Commissioner to design, propose and implement new programs. However, the administrative hearing pursuant to this remand will not prevent the Commissioner and State Board from undertaking any remedial action under *N.J.S.A.* 18A:7A–14 to –16 that would otherwise be appropriate, provided administrative adjudication of the claims is not delayed.

Accordingly, the judgment of the Appellate Division is reversed. The case is transferred to the Commissioner of Education for further proceedings consistent with this opinion. Jurisdiction is not retained.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*Opposed*—None.