762 A.2d 620

PLANNED PARENTHOOD OF CENTRAL NEW JERSEY; PLANNED PARENTHOOD ASSOCIATION OF THE MERCER AREA; AMERICAN ACADEMY OF PEDIATRICS/NEW JERSEY CHAPTER; METROPOLITAN SURGICAL ASSOCIATES, INC., D/B/A METROPOLITAN MEDICAL ASSOCIATES; CHERRY HILL WOMEN'S SURGERY CENTER; WOMEN'S CHOICE MEDICAL CENTER; DOCTORS OF WEST NEW YORK; SOUTH JERSEY WOMEN'S CENTER; GYNE SURGICAL ASSOCIATES OF MIDDLESEX COUNTY, P.A.; WOMEN'S SURGICARE OF HOWELL, P.A.; GERSON WEISS, M.D.; HERBERT HOLMES, M.D. AND GEORGE DAINOFF, D.O., PLAINTIFFS–APPELLANTS, v. JOHN J. FARMER, JR., ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, IN HIS OFFICIAL CAPACITY, AND HIS SUCCESSORS IN OFFICE; CHRISTINE GRANT, COMMISSIONER, DEPARTMENT OF HEALTH AND SENIOR SERVICES OF THE STATE OF NEW JERSEY, IN HER OFFICIAL CAPACITY, AND HER SUCCESSORS IN OFFICE; HON. RICHARD S. WILLIAMS, DIRECTOR, ADMINISTRATIVE OFFICE OF THE COURTS OF THE STATE OF NEW JERSEY, IN HIS OFFICIAL CAPACITY, AND HIS SUCCESSORS IN OFFICE, DEFENDANTS–RESPONDENTS.

Argued January 19, 2000—Decided August 15, 2000.

610

*Jennifer Dalven,* a member of the New York bar, argued the cause for appellants (*Lenora M. Lapidus,* Director, American Civil Liberties Union of New Jersey, attorney; *Ms. Lapidus, Ms. Dalven, Catherine Weiss* and *Julie Sternberg,* a members of New York bar, on the brief).

*Michael J. Haas,* Assistant Attorney General, argued the cause for respondents (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

*Michael Patrick Carroll,* submitted a brief on behalf of *amicus curiae* New Jersey Right to Life.

*James Katz,* submitted a brief on behalf or *amici curiae* American Medical Women's Association, Inc., The Society for Adolescent Medicine, and Physicians for Reproductive Choice and Health (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano,* attorneys).

*Russell J. Passamano,* submitted a brief on behalf of *amici curiae* Life Education and Resource Network—New Jersey, LifeNet, Inc., Abortions Aftermath, League of American Families and New Jersey Family Policy Council.

*Ann R. Bartlett,* submitted a brief on behalf of *amicus curiae* New Jersey State Bar Association.

The opinion of the Court was delivered by

PORITZ, C.J.

■ In this appeal plaintiffs challenge a state statute that conditions a minor's right to obtain an abortion on parental notification unless a judicial waiver is obtained, but imposes no corresponding limitation on a minor who seeks "medical and surgical care [otherwise] related to her pregnancy or her child." *N.J.S.A.* 9:17A–1; §§ 1.2 *et seq.* The State responds that its substantial interests in "protecting" immature minors, "in fostering the family," and in preserving "the rights of parents to rear their children" justify that differential treatment. *N.J.S.A.* 9:17A–1.2. We decide today that the classification created by the Legislature burdens the "fundamental right of a woman to control her body and destiny," *Right to Choose v. Byrne,* 91 *N.J.* 287, 306, 450 *A.2d* 925 (1982), without adequate justification and cannot be sustained against plaintiffs' equal protection challenge.

We acknowledge that the State has a substantial interest in preserving the family and protecting the rights of parents. When

weighed against the right of a young woman to make the most personal and intimate decision whether to carry a child to term, however, the insubstantial connection between the notification requirement and the interests expressed by the State is not sufficient to sustain the statute. We emphasize that our decision in no way interferes with parents' protected interests, nor does it prevent pregnant minors or their physicians from notifying parents about a young woman's choice to terminate her pregnancy. Simply, the effect of declaring the notification statute unconstitutional is to maintain the State's neutrality in respect of a minor's childbearing decisions and a parent's interest in those decisions. In effect, the State may not affirmatively tip the scale against the right to choose an abortion absent compelling reasons to do so.

We also emphasize, once again, that our holding is not based on, nor do we "presume to answer the profound questions about the moral, medical, and societal implications of abortion." *Id.* at 299, 450 *A.*2d 925. At the end of the day, those questions are left to the individual to decide for herself. A young woman's right to choose, to personal dignity and autonomy, is imbedded in the liberties found in the Constitutions of the United States and of this State. As Justice O'Connor has so eloquently explained: "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Planned Parenthood v. Casey,* 505 *U.S.* 833, 851, 112 *S.Ct.* 2791, 2807, 120 *L.Ed.*2d 674, 698 (1992). Because a minor's right to control her reproductive decisions is among the most fundamental of the rights she possesses, and because the State has failed to demonstrate a real and significant relationship between the statutory classification and the ends asserted, we hold that the statute violates the Constitution of the State of New Jersey.

I

The Parental Notification for Abortion Act was signed into law on June 28, 1999, by its terms to take effect ninety days thereaf-

ter. *L.* 1999, *c.* 145, § 2 to 13 (codified at *N.J.S.A.* 9:17A–1.1 to –1.12). Prior to the effective date, plaintiffs [1] sought a declaratory judgment and preliminary injunction precluding enforcement of the Act. The trial court, proceeding by Order to Show Cause, summarily dismissed plaintiffs' challenge on a determination that they had failed to demonstrate a likelihood of success on the merits. This Court stayed implementation of the Act on September 27, 1999, pending an expedited disposition on the merits in the Chancery Division and direct certification to the Court. *See R.* 2:12–1. The matter is now before us pursuant to our Order.

### A. *The Parental Notification for Abortion Act*

We have previously adverted to the legislative findings that provide the underlying rationale for the Parental Notification Act. More specifically, the Act states:

The Legislature finds that there exist compelling and important State interests in protecting minors against their own immaturity, in fostering the family structure and preserving it as a viable social unit, and in protecting the rights of parents to rear their children.

The Legislature further finds that minors often lack the ability to make fully informed choices that take into account both immediate and long-range consequences of their actions; that the medical, emotional, and psychological consequences of abortion are serious and of indeterminate duration, particularly when the patient is a minor; that parents ordinarily possess information essential to a physician's exercise of his best medical judgment concerning their child; and that parents who are aware that their minor daughter has had an abortion may better insure that the minor receives adequate medical attention after her abortion. The Legislature further finds that parental consultation regarding abortion is desirable and in the best interests of the minor.

[*N.J.S.A.* 9:17A–1.2.]

Toward those ends, the Act requires a physician to wait "at least 48 hours after written notice of the pending abortion has been delivered in the manner specified in this act" before perform-

---

[1] The plaintiffs are reproductive health care centers, non-profit professional associations, ambulatory surgical facilities, and individual doctors who provide a wide range of obstetric services. Respondents are the Attorney General of the State of New Jersey, the Commissioner of the New Jersey Department of Health and Senior Services (DHSS), and the Director of the Administrative Office of the Courts of the State of New Jersey (AOC) (collectively, "the State").

ing an abortion on "an unemancipated minor," *N.J.S.A.* 9:17A–1.4(a), such notice to be "delivered personally to the parent by the physician." *N.J.S.A.* 9:17A–1.4(b). Instead of "personal delivery,"

notice may be made by certified mail addressed to the parent at the parent's last known address with return receipt requested and restricted delivery to the addressee, which means a postal employee may only deliver the mail to the authorized addressee. At the same time that notice is mailed by certified mail, it shall also be sent by first class mail to the parent at the parent's last known address. The 48 hour period for notice sent under the provisions of this subsection shall begin at noon on the next day on which regular mail delivery takes place following the day on which the mailings are posted.

[*N.J.S.A.* 9:17A–1.4(c).]

The Act explains that a "parent"

means a parent with care and control of the unemancipated minor, unless the parent has no custodial rights; or if there is no parent with care and control, then the foster parent or the guardian of the unemancipated minor; or a person standing in loco parentis to the unemancipated minor,

and a "person standing in loco parentis"

means (1) that the biological or adoptive parent consented to and fostered, the person's formation and establishment of a parent-like relationship with the minor; (2) that the person and the minor live together in the same household; (3) that the person assumed obligations of parenthood by taking significant responsibility for the minor's care, education and development, including contributing towards the minor's support, without expectation of financial compensation; and (4) that the person has been in a parental role for a length of time sufficient to have established with the minor a bonded, dependent relationship parental in nature.

[*N.J.S.A.* 9:17A–1.3.]

Notice is not otherwise required if a parent certifies that he or she has been informed about the pending abortion by setting forth "in a notarized writing that notice was received." *N.J.S.A.* 9:17A–1.5. Notice is also not required if "the attending physician certifies in the unemancipated minor's medical records that the abortion is necessary due to a medical emergency." *N.J.S.A.* 9:17A–1.6. Alternatively, when that finding cannot be made, a minor may seek a judicial waiver of the notification requirement by filing a petition or motion with a judge of the Superior Court. *N.J.S.A.* 9:17A–1.7(a). The minor is entitled to "court appointed counsel," *N.J.S.A.* 9:17A–1.7(b), and to waiver proceedings that

shall be confidential and insure the anonymity of the minor and [that] shall be given precedence over other pending matters so that the court may reach a decision promptly and without delay so as to serve the best interests of the minor.

[*N.J.S.A.* 9:17A–1.7(c).]

Unless the minor is granted an extension, the judge must rule on the petition or motion for waiver within forty-eight hours or the application is deemed "granted and the notice requirement shall be waived." *Ibid.* A waiver of notification must be authorized "[i]f the judge finds, by clear and convincing evidence," that the minor is "sufficiently mature," *N.J.S.A.* 9:17A–1.7(d)(1); that the minor is being subjected to "a pattern of physical, sexual or emotional abuse," *N.J.S.A.* 9:17A–1.7(d)(2); or that "notification of the parent is not in the best interests of the minor," *N.J.S.A.* 9:17A–1.7(d)(3). Despite the confidentiality provision of the statute, the Division of Youth and Family Services is to be informed when a determination of abuse is made. *N.J.S.A.* 9:17A–1.7(d)(2). When a judge does not make findings permitting waiver, the physician must comply with the notice provisions of the Act before performing an abortion procedure. *N.J.S.A.* 9:17A–1.7(e). Failure to provide the required notice can subject the physician to civil liability in an action brought by a minor's parents and to civil penalties ranging from $1000 to $5000. *N.J.S.A.* 9:17A–1.10.

The Act also requires the DHSS to "prepare a fact sheet for distribution to unemancipated pregnant minors who are seeking abortion services." *N.J.S.A.* 9:17A–1.8. The fact sheet is to be "written in terms generally understood by a teenager" and must describe the notification and waiver provisions of the Act, including the "procedure established by the court for petitioning or making a motion before the court." *Ibid.* Finally, *N.J.S.A.* 9:17A–1.11 directs the Commissioner of Health and Senior Services to promulgate rules that physicians must "follow in effectuating the notice required" by the Act.[2]

On September 8, 1999, the AOC issued a Directive regarding implementation of the Act's judicial waiver provisions. Under the

---

[2] We are informed by certification that the DHSS fact sheet was prepared prior to the effective date of the Act in September 1999. The regulations for physicians were proposed by DHSS on August 16, 1999, and filed with the Office

Directive, a minor seeking an abortion must file a petition in the Chancery Division, Family Part, "in the county where [she] resides, in the county where the abortion is proposed to occur, or in the county where [she] is being sheltered." *AOC Directive No. 10–99* § II(A) (Sept. 8, 1999). A filing may be made "Monday through Friday during the normal working hours of the Family Division," *id.* § II(B)(1), and is handled by a member of the county's Judicial Bypass Team who assists the minor in navigating the procedural shoals of the waiver process. *Id.* § II(C)(1)(3). All proceedings are confidential, as required by statute, "and the anonymity of the minor [is] preserved." *Id.* §§ II(G)(2), IV. The Directive also provides that the court shall enter an order dismissing the petition if the minor fails to appear for the waiver hearing. *Id.* § II(G)(10).

If her petition is denied, the minor may seek review in the Appellate Division. Two Appellate Division judges have been recalled to handle appeals from orders by the trial court denying waivers. *Supplement to AOC Directive No. 10–99* at 1 (Sept. 22, 1999). The judges must hold oral argument not later than two business days after receiving the record from the parties. *Id.* at 3. Should the minor seek further review by this Court, she must file her Notice of Petition for Certification or Notice of Appeal "within two business days of the Appellate Division's decision," along with "a written statement of reasons why the Supreme Court should review the matter." *Ibid.* The Supplemental Directive further provides that "[t]he Supreme Court shall enter ... judgment within two business days following oral argument or the submission of the matter to the Court on the papers." *Id.* at 4.

## B. *The Trial Court Proceedings*

Plaintiffs claim that the Notification Act infringes on a minor's right to privacy and to equal protection of the law granted in

---

of Administrative Law on September 24, 1999. Both the regulations and the fact sheet explain in detail the requirements of the Act.

Article I, paragraph 1, of the New Jersey Constitution. Plaintiffs also claim that the statutory waiver provision fails "to ensure a confidential and expeditious alternative to the Act's parental notification requirement...." Because of those alleged infirmities, plaintiffs seek a declaration that the Act is facially unconstitutional and the entry of a permanent injunction prohibiting the State from enforcing the Act.

On remand from this Court for disposition on the merits, the parties agreed that the matter should be heard "solely on briefs and certifications." The trial court, after hearing argument, issued a written opinion on December 10, 1999, sustaining the Act. *Planned Parenthood v. Farmer,* No. BER–C–362–99, 1999 *WL* 1138605 (N.J.Super.Ct. Ch. Div. Dec. 10, 1999). The court first considered the appropriate standard of review to be applied in a facial challenge but could find no New Jersey case directly on point. *Id.* at \*3. On a review of relevant federal caselaw, it chose the standard adopted by the plurality in *Casey, supra,* 505 *U.S.* at 876–77, 112 *S.Ct.* at 2820–21, 120 *L.Ed.*2d at 714–15, namely, whether the statute at issue presents an undue burden to a woman's fundamental right to choose " 'in a large fraction of the cases.' " *Farmer, supra,* 1999 *WL* 1138605, at \*4 (quoting *Casey, supra,* 505 *U.S.* at 895, 112 *S.Ct.* at 2830, 120 *L.Ed.*2d at 726).

The court next turned to the right of privacy found in the New Jersey Constitution within Article I, paragraph 1, and discussed by this Court in a series of cases related to the more personal and intimate aspects of the right. *See, e.g., In re Grady,* 85 *N.J.* 235, 249, 426 *A.*2d 467 (1981) (recognizing right to sterilization as component of right of privacy); *State v. Saunders,* 75 *N.J.* 200, 210–14, 381 *A.*2d 333 (1977) (applying right of privacy to sexual conduct between consenting adults); *In re Quinlan,* 70 *N.J.* 10, 38–40, 355 *A.*2d 647 (recognizing right to terminate life as component of right of privacy), *cert. denied,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). Whether the New Jersey Constitution affords greater protection than does the Federal Constitution was considered in the context of other state court responses to laws govern-

ing minors' access to abortions. *Farmer, supra,* 1999 *WL* 1138605, at *5–*7. Noting that only the California Supreme Court has invalidated a parental consent/judicial waiver statute, and that the California court's decision was predicated on an explicit right to privacy in that state's Constitution, the trial court decided that our Constitution had not been so expansively interpreted. *Id.* at *6 (citing *Right to Choose, supra,* 91 *N.J.* at 303–04, 450 *A.*2d 925):

The court found that minors are persons who " 'possess constitutional rights,' " *id.* at *7 (quoting *Planned Parenthood v. Danforth,* 428 *U.S.* 52, 74, 96 *S.Ct.* 2831, 2843, 49 *L.Ed.*2d 788, 808 (1976)), but that the United States Supreme Court, under *Bellotti v. Baird,* 443 *U.S.* 622, 635, 99 *S.Ct.* 3035, 3044, 61 *L.Ed.*2d 797, 808 (1979) (plurality opinion), has permitted the imposition of limitations on those rights for the protection of immature minors. *Farmer, supra,* 1999 *WL* 1138605, at *7, *13. After an exhaustive review of the record, including plaintiffs' certifications, the AOC Directives, the DHSS fact sheet, and other relevant materials, the court held that the Act does not place an undue burden on the minor's right to privacy under the New Jersey Constitution. *Id.* at *16. The court also rejected plaintiffs' equal protection challenge, concluding that differential treatment of minors who choose abortion and minors who choose to carry to term is mitigated by the bypass provision and the State's interest in protecting minors from making ill-informed choices. *Id.* at *18. Ultimately, the trial court sustained the Parental Notification for Abortion Act against plaintiffs' "facial challenge." *Id.* at *19.

## II

Plaintiffs bring their facial challenge to the Notification Act under Article I, paragraph 1, of the Constitution of the State of New Jersey. "[O]rdinarily legislative enactments are presumed to be valid and the burden to prove invalidity is a heavy one." *Bell v. Township of Stafford,* 110 *N.J.* 384, 394, 541 *A.*2d 692 (1988). However, when legislation impinges on a constitutionally protected right, we have looked more closely at the State's pur-

ported justification. *Cf. id.* at 395, 541 *A.*2d 692. In a case such as this, it is difficult for a young woman to bring an as applied challenge when she will lose the opportunity to exercise the fundamental right she seeks to vindicate in a relatively short period of time. The brevity of the gestation period and concerns about confidentiality create special burdens on minors who wish to have an abortion. Notably, every week of delay increases the risk of health problems associated with the abortion procedure and decreases the opportunity to obtain it. Because of those concerns, we consider plaintiffs' facial challenge to the Notification Act under the more stringent standard we use in cases involving as applied challenges to a legislative classification that burdens the exercise of a fundamental right.

This case also requires us to consider whether our State Constitution affords greater protection of a woman's right of privacy than does its federal counterpart. In that undertaking, we again adhere to the principle set out in *Right to Choose,* that, "in appropriate cases, the individual states may accord greater respect than the federal government to certain fundamental rights." *Supra,* 91 *N.J.* at 300, 450 *A.*2d 925. Thus:

> Where provisions of the federal and state Constitutions differ, ... or where a previously established body of state law leads to a different result, ... we must determine whether a more expansive grant of rights is mandated by our state Constitution.

[*Id.* at 301, 450 *A.*2d 925.]

We recognize, however, that caution is required when we extend the protections of our State Constitution beyond the limits set by the United States Supreme Court for parallel provisions in the Federal Constitution. *Id.* at 301, 450 *A.*2d 925 (citing *State v. Hunt,* 91 *N.J.* 338, 344–45, 450 *A.*2d 952 (1982)).

Under the Federal Constitution, a woman has a fundamental right to choose whether to carry her pregnancy to term or to choose an abortion. *Roe v. Wade,* 410 *U.S.* 113, 153, 93 *S.Ct.* 705, 727, 35 *L.Ed.*2d 147, 177 (1973); *see also Stenberg v. Carhart,* 530 *U.S.* 914, ——, 120 *S.Ct.* 2597, 2604, 147 *L.Ed.*2d 743, —— (2000) ("[T]he Constitution offers basic protection to the woman's right to

choose."); *Casey, supra,* 505 *U.S.* at 853, 112 *S.Ct.* at 2808, 120 *L.Ed.*2d at 699 (reaffirming *Roe* ). A woman also has a constitutional right to be free from "unwarranted governmental intrusion" in making that personal and life-altering decision. *Eisenstadt v. Baird,* 405 *U.S.* 438, 453, 92 *S.Ct.* 1029, 1038, 31 *L.Ed.*2d 349, 362 (1972). Most important in this case, those rights belong equally to adults and to minors. *Hodgson v. Minnesota,* 497 *U.S.* 417, 435, 110 *S.Ct.* 2926, 2937, 111 *L.Ed.*2d 344, 360 (1990). As stated by the Supreme Court:

> Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.
>
> [*Planned Parenthood v. Danforth,* 428 *U.S.* 52, 74, 96 *S.Ct.* 2831, 2843, 49 *L.Ed.*2d 788, 808 (1976).]

Nonetheless, as recognized by the court below, the State may place certain restrictions on a minor's exercise of her rights in order to protect her from her own immaturity. *Farmer, supra,* 1999 *WL* 1138605, at *7 (*citing Bellotti, supra,* 443 *U.S.* at 635, 99 *S.Ct.* at 3044, 61 *L.Ed.*2d at 808).

Various restrictions relating to both parental consent and parental notification have been discussed by the United States Supreme Court in a series of cases beginning with *Planned Parenthood v. Danforth, supra,* 428 *U.S.* at 52, 96 *S.Ct.* at 2831, 49 *L.Ed.*2d at 788. Because they are instructive to our consideration of the state constitutional challenge, we review them here.

### A. *Consent Statutes*

In *Planned Parenthood v. Danforth,* the Supreme Court addressed for the first time the constitutionality of a state statute that contained a mandatory parental consent provision, and rejected that part of the statute prohibiting unmarried minors from procuring abortions during the first trimester of their pregnancies without a parent's consent. *Id.* at 75, 96 *S.Ct.* at 2844, 49 *L.Ed.*2d at 808. Five members of the Court determined that a state could not subject a minor's right to terminate her pregnancy to a

parent's absolute veto "without a sufficient justification for the restriction." *Id.* at 74–75, 96 *S.Ct.* at 2844, 49 *L.Ed.*2d at 808.

Shortly thereafter in 1979, the Court assessed the constitutionality of a Massachusetts parental consent statute. *Bellotti, supra,* 443 *U.S.* at 622, 99 *S.Ct.* at 3035, 61 *L.Ed.*2d at 797. The statute in *Bellotti* required unmarried minors to obtain consent from both parents before a physician could perform an abortion. *Id.* at 625, 99 *S.Ct.* at 3038, 61 *L.Ed.*2d at 802. If the parents refused consent, however, a state court judge could, but was not required to, give judicial consent to an abortion without involving the young woman's parents. *Ibid.* A plurality of the Court announced that states requiring parental consent from one or both parents had to provide an alternative process in which a minor could obtain a waiver by demonstrating either that she is sufficiently mature to make the decision on her own with her physician, or that an abortion is in her best interests. *Id.* at 643–44, 99 *S.Ct.* at 3048, 61 *L.Ed.*2d at 813–14. The process, said Justice Powell, must guarantee anonymity and occur expeditiously so that the minor has a realistic opportunity to procure an abortion. *Id.* at 644, 99 *S.Ct.* at 3048, 61 *L.Ed.*2d at 814. The Massachusetts statute was deemed unconstitutional by four members of the Court because it failed to meet those essential conditions. *Id.* at 651, 99 *S.Ct.* at 3052, 61 *L.Ed.*2d at 818. Four other justices concurred in the judgment of the plurality by application of *Danforth* but expressed reservations regarding the burden imposed under a bypass process. *Id.* at 655–56, 99 *S.Ct.* at 3054, 61 *L.Ed.*2d at 821.[3]

In 1983, the Court considered an Ohio statute that, among other things, specifically proscribed abortions for minors under fifteen years of age who did not secure the informed, written consent of

---

[3] Justice White, in dissent, would have approved an absolute parental consent requirement. *Id.* at 656–57, 99 *S.Ct.* at 3054–55, 61 *L.Ed.*2d at 821–22. The *Bellotti* criteria for waiver provisions were later endorsed by a majority of the Court in *Ohio v. Akron Ctr. for Reprod. Health,* 497 *U.S.* 502, 510–14, 110 *S.Ct.* 2972, 2978–81, 111 *L.Ed.*2d 405, 418–20 (1990) (*Akron II* ).

one parent. *City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 *U.S.* 416, 422 n. 4, 103 *S.Ct.* 2481, 2488 n. 4, 76 *L.Ed.*2d 687, 698 n. 4 (1983) (*Akron I* ), overruled in part by *Casey, supra,* 505 *U.S.* at 833, 112 *S.Ct.* at 2791, 120 *L.Ed.*2d at 674. Although the statute contained an exception for minors who obtained a court order permitting the abortion, the exception did not provide adequate alternative waiver procedures. The Court concluded "that Akron may not make a blanket determination that *all* minors under the age of 15 are too immature to make this decision or that an abortion never may be in the minor's best interests without parental approval." *Id.* at 440, 103 *S.Ct.* at 2497, 76 *L.Ed.*2d at 709. On the same day *Akron I* was decided, however, the Court sustained a Missouri parental consent statute that contained an acceptable judicial bypass provision. *Planned Parenthood Ass'n v. Ashcroft,* 462 *U.S.* 476, 493, 103 *S.Ct.* 2517, 2526, 76 *L.Ed.*2d 733, 746 (1983); *id.* at 504, 103 *S.Ct.* at 2532, 76 *L.Ed.*2d at 754 (O'Connor, J., concurring in part in the judgment and dissenting in part) (concluding parental consent statute does not impose undue burden on minors).

Most recently, the Court upheld a Pennsylvania statute requiring one parent's consent before a physician can perform an abortion on an unemancipated minor. *Casey, supra,* 505 *U.S.* at 899, 112 *S.Ct.* at 2832, 120 *L.Ed.*2d at 728–29.[4] That statute passed muster because it too permitted a bypass of parental approval if the minor could show that she was sufficiently mature to make the abortion decision, or that the abortion was in her best interests. *Ibid.; id.* at 970, 112 *S.Ct.* at 2868–69, 120 *L.Ed.*2d at

---

[4] *Casey* is most notable for its reaffirmation of the core holding of *Roe:* "The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade.* It is a rule of law and a component of liberty we cannot renounce." *Id.* at 871, 112 *S.Ct.* at 2817, 120 *L.Ed.*2d at 710. *Casey* also established a new standard for evaluating whether a law violates a woman's right to choose, that is, whether the "state regulation imposes an undue burden on a woman's ability to make this decision." *Id.* at 874, 112 *S.Ct.* at 2819, 120 *L.Ed.*2d at 713.

776 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part).

## B. *Notification Statutes*

In *H.L. v. Matheson,* the Supreme Court approved a Utah statute that required a physician to " '[n]otify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor . . . .' " 450 *U.S.* 398, 400, 101 *S.Ct.* 1164, 1167, 67 *L.Ed.*2d 388, 393 (1981) (quoting *Utah Code Ann.* § 76-7-304(c)(2)). The Court determined that the statute was constitutional as applied to an unemancipated minor who is "living with and dependent on her parents" and has not made any "showing as to her maturity or as to her relations with her parents . . . ." *Id.* at 407-11, 101 *S.Ct.* at 1171-72, 67 *L.Ed.*2d at 397-401. Nine years later, the Court invalidated as unduly burdensome a provision in a parental notification statute that mandated written notice to both parents of an unemancipated minor without providing judicial bypass procedures. *Hodgson, supra,* 497 *U.S.* at 450, 110 *S.Ct.* at 2945, 111 *L.Ed.*2d at 370-71. An alternative section of the statute that contained a bypass process was sustained by a five-member majority. *Id.* at 461, 110 *S.Ct.* at 2951, 111 *L.Ed.*2d at 378 (O'Connor, J., concurring in part and concurring in the judgment in part); *id.* at 499-501, 110 *S.Ct.* at 2971-72, 111 *L.Ed.*2d at 403 (Kennedy, J., concurring in the judgment in part and dissenting in part).

Subsequently, the Court approved an Ohio one-parent notification statute that provided for judicial bypass and met the *Bellotti* criteria for a consent statute. *Akron II, supra,* 497 *U.S.* at 510-13, 110 *S.Ct.* at 2978-81, 111 *L.Ed.*2d at 416-18. The Ohio statute permitted abortions for unemancipated minors: (1) if the physician provided a minimum twenty-four hours actual notice to a parent; (2) if the minor and an alternative relative certified that the minor feared abuse from one of her parents; (3) if one parent provided written consent to the abortion; or (4) if the juvenile court granted a judicial bypass. *Id.* at 507-08, 110 *S.Ct.* at 2977, 111 *L.Ed.*2d at 416. *Akron II* concluded that "a bypass procedure

that will suffice for a consent statute will suffice also for a notice statute." *Id.* at 511, 110 *S.Ct.* at 2979, 111 *L.Ed.*2d at 418.

In *Lambert v. Wicklund,* 520 *U.S.* 292, 293–94, 117 *S.Ct.* 1169, 1169–70, 137 *L.Ed.*2d 464, 468 (1997) (per curiam), the Court evaluated a Montana notification statute that was virtually identical to the statute approved in *Akron II. Lambert* repeated the *Akron II* conclusion that when a state mandates notice, but also provides for a bypass process that is acceptable in a consent statute, the notice provisions are *a fortiori* constitutional. *Id.* at 295–97, 117 *S.Ct.* at 1171–72, 137 *L.Ed.*2d at 467–69. Thus, although the Court has not decided that a parental notification statute must contain a judicial bypass provision, *Lambert* teaches that if a notice statute has a bypass procedure that satisfies *Bellotti,* it must necessarily withstand constitutional scrutiny. *Id.* at 295, 117 *S.Ct.* at 1171, 137 *L.Ed.*2d at 467–68.

## C. *The Basis for Decision*

When faced with a challenge to a notification statute, the United States Supreme Court has relied on a perceived distinction between parental consent and parental notification, namely that a consent statute imposes a more onerous burden than does a notification statute. *Hodgson, supra,* 497 *U.S.* at 496, 110 *S.Ct.* at 2969, 111 *L.Ed.*2d at 400 (Kennedy, J., concurring in the judgment in part and dissenting in part). After holding that a consent statute must include a bypass procedure, the Court reasons that a notification statute with a judicial bypass must be acceptable. *Akron II, supra,* 497 *U.S.* at 511, 110 *S.Ct.* at 2979, 111 *L.Ed.*2d at 418. Thus, *Casey* relies on the now-familiar precedents of *Bellotti, Akron II,* and *Hodgson* to explain why a notice statute containing a bypass is constitutional. *Casey, supra,* 505 *U.S.* at 899, 112 *S.Ct.* at 2832, 120 *L.Ed.*2d at 729. Yet, despite its holding that a reviewing court must, in such cases, consider whether the "state regulation imposes an un-due burden on a woman's ability" to exercise her right to choose, *id.* at 874, 112 *S.Ct.* at 2819, 120 *L.Ed.*2d at 713, *Casey* does not address the actual burdens im-

posed by the bypass process.[5]   As for *Bellotti, Akron II* and *Hodgson,* only the concurring or dissenting Justices in those earlier cases actually discuss the impact of those burdens on young women who seek abortions. *Akron II, supra,* 497 *U.S.* at 526–38, 110 *S.Ct.* at 2985–91, 111 *L.Ed.*2d at 428–36 (Blackmun, J., dissenting) (detailing barriers in "obstacle course" of judicial bypass procedure that detrimentally affect abused minors); *Hodgson, supra,* 497 *U.S.* at 464–79, 110 *S.Ct.* at 2952–60, 111 *L.Ed.*2d at 379–89 (Marshall, J., concurring in the judgment in part and dissenting in part) (discussing psychological impact of forced notification and health risks of delay); *Matheson, supra,* 450 *U.S.* at 437–41, 101 *S.Ct.* at 1185–88, 67 *L.Ed.*2d at 416–19 (Marshall, J., dissenting) (recognizing that "threat of parental notice" endangers minors' health; leads to delays, self-abortions, or illegal abortions; or forces minors to carry to term); *Bellotti, supra,* 443 *U.S.* at 655, 99 *S.Ct.* at 3054, 61 *L.Ed.*2d at 820–21 (Stevens, J., concurring) (noting that judicial bypass procedure to "secure the consent of the sovereign" is potentially greater burden than obtaining parental consent because vesting absolute veto power in one judge is "particularly troubling").

In *Akron II,* for example, the majority held without further comment that the Ohio notification statute did not violate the Due Process Clause:

The confidentiality provisions, the expedited procedures, and the pleading form requirements, on their face, satisfy the dictates of minimal due process.  We see little risk of erroneous deprivation under these provisions and no need to require additional procedural safeguards.

[*Akron II, supra,* 497 *U.S.* at 517, 110 *S.Ct.* at 2982, 111 *L.Ed.*2d at 422.]

Nor were the burdens of the judicial bypass thoroughly examined by the majority in *Hodgson.*   There, the Court reviewed *Bellotti* and decided that notifying one's parents about an abortion, as in

---

[5] *Casey* simply states that parental notification and consent statutes have been upheld "based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart." *Id.* at 895, 112 *S.Ct.* at 2830, 120 *L.Ed.*2d at 726.

*Hodgson,* is a far less taxing undertaking than obtaining consent for an abortion, as in *Bellotti. Hodgson, supra,* 497 *U.S.* at 499–500, 110 *S.Ct.* at 2971, 111 *L.Ed.*2d at 403. As noted, the two-parent notification statute in *Hodgson* was found to be constitutional because it satisfied the prerequisites for a parental consent statute. *Id.* at 497–98, 110 *S.Ct.* at 2970, 111 *L.Ed.*2d at 401–02. Most recently, the Court repeated that theme in *Lambert,* which concerned a statute identical to the one upheld in *Akron II. Lambert, supra,* 520 *U.S.* at 295–97, 117 *S.Ct.* at 1171–72, 137 *L.Ed.*2d at 468–69. Even in *Bellotti,* the case that described the bypass requirements for a parental consent statute, there is no discussion of the burdens imposed by those requirements. *Bellotti, supra,* 443 *U.S.* at 643–4, 99 *S.Ct.* at 3048–49, 61 *L.Ed.*2d at 813–14.

Finally, we observe that the United States Supreme Court has reviewed states' consent and notification statutes on due process grounds without discussion of the parties' equal protection arguments. As a consequence, that body of caselaw offers little guidance concerning the treatment of different classes of young women under equal protection principles—*i.e.,* those who seek an abortion and those who seek medical and/or surgical care (related to pregnancy and childbirth).

### III

Other states have enacted legislation that is similar but not identical to New Jersey's Parental Notification Act. Courts in those states have therefore considered the issues now before us, generally in the context of state constitutional provisions that correspond to ours. Those cases also inform our decision today.

Most of the state courts that have examined either parental consent or parental notification statutes have relied on federal caselaw to uphold their states' laws. We will not repeat the discussion in those cases because it tracks cases we have already considered. *See, e.g., In re Anonymous,* 531 *So.*2d 901, 903–04 (Ala.1988); *Pro–Choice Miss. v. Fordice,* 716 *So.*2d 645, 656 (Miss.

1998); *In re Anonymous,* 251 *Neb.* 424, 558 *N.W.*2d 784, 789 (1997). Recently, however, California and Massachusetts have rejected, on state constitutional grounds, variants of parental consent statutes containing judicial bypass provisions. *American Academy of Pediatrics v. Lungren,* 16 *Cal.*4th 307, 66 *Cal.Rptr.*2d 210, 940 *P.*2d 797, 804–05 (1997); *Planned Parenthood League v. Attorney Gen.,* 424 *Mass.* 586, 677 *N.E.*2d 101, 103 (1997). The Massachusetts Supreme Court, relying in part on *Hodgson, supra,* 497 *U.S.* at 417, 110 *S.Ct.* at 2926, 111 *L.Ed.*2d at 344, invalidated a two-parent consent requirement, but allowed one-parent consent because

[t]he burden … on a minor to seek and obtain the consent of both parents can force her, even when one parent consents, to turn to the judicial bypass for relief.… To require that a minor follow such a process when the purpose of parental consent is fulfilled by the consent of one parent is to burden the minor's constitutional rights without adequate justification.

[*Planned Parenthood League, supra,* 677 *N.E.*2d at 108.]

In *Lungren,* however, California's highest court relied on that state's explicit constitutional guarantee of privacy in determining whether California could require parental consent before a minor could obtain an abortion. *Lungren, supra,* 66 *Cal.Rptr.*2d 210, 940 *P.*2d at 816. Under California law, "when a statute impinges upon a constitutional right, legislative findings with regard to the need for, or probable effect of, the statutory provision [are not] considered determinative for constitutional purposes." *Id.* at 824. Thus, the court examined the state's claim

that the restrictions imposed by [the] statute upon a minor's constitutionally protected right of privacy are necessary to protect the physical and emotional health of a pregnant minor [and held that those restrictions were] undermined by the circumstance that California law authorizes a minor, without parental consent, to obtain medical care and make other important decisions in analogous contexts that pose at least equal or greater risks to the physical, emotional, and psychological health of a minor and her child as those posed by the decision to terminate pregnancy.

[*Id.* at 826.]

The court was unable to reconcile California's alleged interest in "a minor's emotional or psychological health" in respect of the abortion decision with the state's silence on a minor's decision to

give birth or to give her child up for adoption. *Id.* at 827. In the same vein, the existence of a variety of medical emancipation statutes applicable to minors further undermined the state's claim that the parental consent statute was "necessary ... to sustain the parent-child relationship." *Ibid.* Ultimately, *Lungren* held that the State had failed to put forward "adequate justification for the statute's intrusion on a pregnant minor's right to privacy under the California Constitution." *Id.* at 831.

## IV

■ Article I, paragraph 1, of the New Jersey Constitution provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

The language of that paragraph is "more expansive ... than that of the United States Constitution...." *Right to Choose, supra,* 91 *N.J.* at 303, 450 *A.*2d 925. It incorporates within its terms the right of privacy and its concomitant rights, including a woman's right to make certain fundamental choices. Thus, in New Jersey, we have a long-standing history that begins even prior to *Roe v. Wade, see Gleitman v. Cosgrove,* 49 *N.J.* 22, 62–63, 227 *A.*2d 689 (1967) (Weintraub, C.J., dissenting in part), demonstrating a commitment to the protection of individual rights under the State Constitution. *Right to Choose, supra,* 91 *N.J.* at 304, 450 *A.*2d 925 (citing, among other cases, *Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981) (holding that mother, after giving birth to child with cystic fibrosis, had right to choose whether to conceive second child who might suffer from same genetic defect)); *see Grady, supra,* 85 *N.J.* at 249, 426 *A.*2d 467; *Saunders, supra,* 75 *N.J.* at 210, 381 *A.*2d 333; *Quinlan, supra,* 70 *N.J.* at 38, 355 *A.*2d 647. It is with that body of caselaw in mind that we turn to plaintiffs' equal protection challenge.

### A. *Right to Choose v. Byrne*

*Right to Choose v. Byrne* is this Court's seminal case addressing equal protection and abortion rights under the New Jersey Consti-

tution. 91 *N.J.* 287, 450 *A.*2d 925 (1982). The New Jersey Legislature had restricted state Medicaid funding of abortions to only those abortions necessary to preserve the life of the mother. *Id.* at 294, 450 *A.*2d 925. The statute thereby premised funding on the distinction between an abortion necessary to preserve a woman's life and an abortion necessary to protect a woman's health. *Id.* at 292, 450 *A.*2d 925. At the time the Court decided *Right to Choose,* the Supreme Court of the United States had recently handed down *Harris v. McRae,* 448 *U.S.* 297, 326, 100 *S.Ct.* 2671, 2693, 65 *L.Ed.*2d 784, 811 (1980), which held that the Equal Protection Clause did not prohibit Congress from proscribing the use of Medicaid funds for an abortion except when required to save the life of the mother. We held to the contrary under equal protection principles found in our State Constitution. *Right to Choose, supra,* 91 *N.J.* at 310, 450 *A.*2d 925.

*Right to Choose,* in considering the state equal protection claim, first applied the analytical framework developed by the United States Supreme Court in parallel cases under the Federal Constitution—a tiered equal protection analysis generally using either a rational-basis or strict-scrutiny review. *Right to Choose, supra,* 91 *N.J.* at 305–06, 450 *A.*2d 925 (citing, *e.g., San Antonio Sch. Dist. v. Rodriguez,* 411 *U.S.* 1, 28–29, 93 *S.Ct.* 1278, 1293–94, 36 *L.Ed.*2d 16, 39–41 (1973); *Roe v. Wade, supra,* 410 *U.S.* at 163–65, 93 *S.Ct.* at 731–33, 35 *L.Ed.*2d at 182–84). We observed, however, that in cases involving a classification that "indirectly infringes on a fundamental right," *Right to Choose, supra,* 91 *N.J.* at 310, 450 *A.*2d 925, the inflexibility of the tiered framework prevents a full understanding of the clash between individual and governmental interests. *Id.* at 308–09, 450 *A.*2d 925. Rather, we adopted a test that weighed the governmental interest in the statutory classification against the interests of the affected class. Subsequently, in *Greenberg,* we explained:

In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction.

[*Supra,* 99 *N.J.* at 567, 494 *A.*2d 294.]

In *Right to Choose,* the Court placed a woman's health and privacy on one side of the scale and weighed those interests against the State's interest in potential life. *Supra,* 91 *N.J.* at 310, 450 *A.*2d 925. The Court held that the government had unreasonably interfered with a woman's fundamental right to choose an abortion when necessary to protect her life or health. *Ibid.* The Court declined, however, to hold that all statutory funding restrictions on abortion are unconstitutional. *Ibid.* Instead, it decided that the State's equal protection guarantee barred discrimination against a particular class of pregnant women because it could not be justified by a compelling state interest. *Id.* at 308, 310, 450 *A.*2d 925. In lieu of striking the entire statute, the State was required to fund "those abortions medically necessary to preserve the life or health of the woman." *Id.* at 312, 450 *A.*2d 925; *cf. Doe v. Poritz,* 142 *N.J.* 1, 94, 662 *A.*2d 367 (1995) (applying equal protection balancing test enunciated in *Right to Choose* ); *Greenberg, supra,* 99 *N.J.* at 576, 494 *A.*2d 294 (same). That holding, consistent with New Jersey's more expansive constitutional provision, gave women seeking to exercise their right to choose greater protection than the protection afforded in *Harris v. McRae.*

## B. *Application of the Right to Choose Balancing Test to the Notification Act*

The Parental Notification for Abortion Act is designed to impose restrictions on young women who seek an abortion, treating them differently than it treats young women who decide to carry to term. We employ the *Right to Choose* balancing test to determine whether that differential treatment unfairly burdens only one class of young women, thereby violating the State Constitution's guarantee of equal protection.[6]

Our inquiry begins with an examination of the nature of the affected right. We have earlier discussed the importance of a

---

[6] In his dissent, Justice O'Hern finds that the classification created by the Notification Act does not violate equal protection because it is rationally related

woman's right to control her body and her future, a right we as a society consider fundamental to individual liberty. *Ante* at 620–21, 762 *A.*2d at 626. Although we will not repeat that discussion here, we are keenly aware of the principle of individual autonomy that lies at the heart of a woman's right to make reproductive decisions and of the strength of that principle as embodied in our own Constitution. We have not hesitated, in an appropriate case, to read the broad language of Article I, paragraph 1, to provide greater rights than its federal counterpart. Our precedents make clear that the classification created by the statute is deserving of the most exacting scrutiny.

We next consider the extent of the governmental restriction on that fundamental right. The Notification Act requires a minor either to tell a parent that she intends to have an abortion or to obtain a judicial waiver permitting her to bypass parental notification. The minors who choose abortion are therefore subject to burdens not imposed on minors who do not. The greater the burden on the underlying right, the more difficult it is to sustain the State's classification.

The record reflects that the Act significantly burdens unemancipated women seeking abortions. In analyzing those burdens, we rely on extensive and detailed certifications submitted by the plaintiffs.[7] Mindful that those submissions have been presented

---

"to a legitimate governmental objective." *Post* at 652, 762 *A.*2d at 644. He applies a rational basis standard because he believes the "essence of the right to choose" is not "substantially interfered with." *Ibid.* In our view, Justice O'Hern improperly uses the degree of interference with the right as the basis for choosing the level of scrutiny to apply. Under New Jersey law, we apply the *Right to Choose* balancing test, wherein we weigh the degree of interference against the state's asserted need for the interference. Indeed, "where an important personal right is affected by government action, [our] Court often requires the public authority to demonstrate a greater public need than is traditionally required in construing the federal constitution." *Abbott v. Burke,* 100 *N.J.* 269, 295, 495 *A.*2d 376 (1985) (internal quotations omitted).

[7] The following professionals with significant experience in these matters submitted certifications in support of plaintiff's claims: Nancy A. Adler, Ph.D.,

by advocates, and that there is little in the record to contradict the factual context that they provide,[8] we nonetheless believe that they are a source of important information and useful insights into the impact of the Notification Act on young women who seek abortions.

From those certifications we have learned that pregnant minors as a group take much longer to make the decision whether to have an abortion. Many are unable to recognize that they are pregnant because minors frequently have irregular menstrual cycles. In arranging for an abortion, minors must overcome their unfamiliarity with the health-care system and their lack of financial resources. Those factors create time delays that affect the cost and availability of an abortion even without the demands of a statutory notification process.

---

Director of the Health Psychology Program and Vice Chair of the Department of Psychiatry, University of California at San Francisco; Susan Cohen Esquilin, Ph.D., Director of Psychology Training and Assistant Professor of Psychiatry, New Jersey Medical School (which is part of the University of Medicine and Dentistry of New Jersey (UMDNJ)); Stanley Henshaw, Ph.D., Deputy Director of Research, Alan Guttmacher Institute; Herbert Holmes, M.D., specialist in obstetrics and gynecology, and Clinical Associate Professor, UMDNJ; Darrah D. Johnson, Health Educator and Counselor, Planned Parenthood Association of the Mercer Area; Phyllis Kinsler, M.S., President and Chief Executive Officer, Planned Parenthood of Central New Jersey; the Honorable Gerald C. Martin, District Court Judge, Sixth Judicial District of Minnesota, handling juvenile, probate, family law, and abortion-waiver matters for southern St. Louis County, Minnesota; Jamie Sabino, Chair of the Judicial Consent for Minors Lawyer Referral Panel in Massachusetts; Joel Tumberello, R.N., M.S., N.P.C., nurse practitioner, Cherry Hill Women's Center, Cherry Hill, New Jersey; Gerson Weiss, M.D., Professor and Chair of the Department of Obstetrics and Gynecology at New Jersey Medical School and Chief of Service of the Department of Obstetrics and Gynecology at University Hospital, UMDNJ; and Laurie Schwab Zabin, Ph.D., Professor in the Department of Population and Family Health Sciences, Johns Hopkins School of Hygiene and Public Health, with a Joint Appointment to the Department of Gynecology and Obstetrics at Johns Hopkins School of Medicine.

8 The Attorney General relies on the Act, the legislative findings, the AOC Directives, the DHSS fact sheet, and the decisions of other courts in support of his position.

In cases where a minor wishes to notify her parent, the parent must locate a notary and complete the form attached to the DHSS fact sheet. The minor then must take the notarized form and present it to her doctor. Alternatively, the doctor could send a notice to the minor's parent via restricted, certified mail, with the caveat that notice can be delivered to, and accepted by, only the one parent specified in the notice. As a final alternative, the abortion provider could seek out the parent and hand-deliver a notice of abortion, but that alternative is extremely onerous for the provider and may not be a real-world possibility. Counterbalanced against those burdens, we are told that, without the statute, physicians suggest to young women that they should tell a parent about their decision and that most young women do so. In fact, the record indicates that most young women voluntarily inform their parents about their intention to seek an abortion.

Apart from the delay caused by the bypass process itself, then, a minor may seek an abortion many months into her pregnancy. The passage of time creates substantial difficulties, including, among others, increased costs. Those increases range from $500 for an abortion at twelve to fourteen weeks LMP,[9] to $700 for an abortion at fifteen weeks LMP, $1000 at twenty weeks LMP, and $1395 for the procedure at twenty-two weeks LMP. Moreover, as pregnancies progress, fewer providers are available to perform abortions. Studies cited in plaintiffs' certifications indicate that the risk of death increases with each week of gestation from nine weeks to twenty weeks LMP, which explains why second trimester abortions are often performed in a hospital. We are troubled by the prospect, also advanced by the certifications, that in attempting to exercise their rights minors may elect to leave the State or, in cases where the delay is significant, may use unlicensed doctors or unorthodox procedures in procuring an abortion.

---

[9] LMP is a medical term of art that indicates the number of weeks since a woman's last menstrual period.

Most important, however, a notification statute can operate as a functional bar to a minor's exercise of her constitutional right to make her own reproductive decisions. *Cf. Casey, supra,* 505 *U.S.* at 892–94, 112 *S.Ct.* at 2828–29, 120 *L.Ed.*2d at 724–25 (detailing plight of women who cannot inform their husbands about their abortions). We know that

> [m]any minor women will encounter interference from their parents after the state-imposed notification. In addition to parental disappointment and disapproval, the minor may confront physical or emotional abuse, withdrawal of financial support, or actual obstruction of the abortion decision.
>
> [*Matheson, supra,* 450 *U.S.* at 438–39, 101 *S.Ct.* 1186–87, 67 *L.Ed.*2d at 416–17 (Marshall, J., dissenting).]

In many cases, "[a]s a practical matter, a notification requirement will have the same deterrent effect on a pregnant minor seeking to exercise her constitutional right as does a consent statute." *Akron II, supra,* 497 *U.S.* at 526, 110 *S.Ct.* at 2985, 111 *L.Ed.*2d at 428 (Blackmun, J., dissenting); *Hodgson, supra,* 497 *U.S.* at 472, 110 *S.Ct.* at 2956, 111 *L.Ed.*2d at 385 (Marshall, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("A parent who objects to the abortion, once notified, can exert strong pressure on the minor ... to block her from getting an abortion.... In such circumstances, the notification requirement becomes, in effect, a consent requirement."); *Indiana Planned Parenthood v. Pearson,* 716 *F.*2d 1127, 1132 (7th Cir.1983) ("Although notification requirements do not give parents the legal power to veto their daughter's abortion decision, as a practical matter they may.").

The State responds to those concerns by pointing to the waiver provision, in essence arguing that if there are young women who feel that notification is inappropriate, then those young women can petition a judge of the Superior Court to grant a waiver from the notification requirement. But the judicial waiver provisions impose far greater burdens on minors who, for very good reasons recognized by the statute, are unable to communicate with their parents about their decision.

In the first instance, a young woman must find a way to place the initial call to the courthouse to begin the waiver process. Next, if she chooses to have an attorney, as provided by the Act, she must find a time when she can take his or her telephone call without the knowledge of her parents or siblings. Then the young woman must get to the courthouse, which may be difficult depending on distance and access to transportation. To complicate matters further, she may well have to be absent from school and risk her parents finding out that she has been truant in order to attend a judicial proceeding.

The judicial proceeding itself presents a danger that the young woman's anonymity will be breached. A realistic concern is that a minor could be recognized by members of the community who know her while she is at the courthouse to attend the hearing. A Minnesota judge who has handled waiver proceedings concurs in that observation, adding that the young woman may happen on schoolmates attending their own juvenile court hearings. The same judge reports that one teenager's parents received an anonymous letter informing them that their daughter had been seen in the courthouse seeking a judicial bypass. For the young woman whose relatives or friends are employed in or visiting the courthouse, the Notification Act may seriously compromise her anonymity because those persons who see her will likely become suspicious about why she is not in school on a weekday. *See* Anna Quindlen, *Mom, Dad and Abortion,* N.Y. Times, July 1, 1990, § 4, at E17 (noting that director of Duluth, Minnesota, abortion clinic recalls transporting young women to bypass hearings in freight elevator to avoid neighbors and relatives working in courthouse).

Even assuming a confidential and expeditious waiver hearing, the process will nonetheless cause significant delay. The United States Supreme Court has acknowledged that a "pregnant adolescent . . . cannot preserve for long the possibility of aborting, which effectively expires in a matter of weeks from the onset of pregnancy." *Bellotti, supra,* 443 *U.S.* at 642, 99 *S.Ct.* at 3047, 61 *L.Ed.*2d at 813. A similar bypass process in Massachusetts causes a delay

of about two weeks and sometimes as much as a month. That means a first trimester abortion can become a more difficult and more costly second trimester abortion, or even, if it is far enough into the gestation period, that an abortion will no longer be available. We are not surprised to learn that the Massachusetts law drives young women to neighboring states to find help elsewhere. With time running out, it is inevitable that some minors will seek an alternative solution rather than tell an abusive parent or a judge who is a stranger about their decision to procure an abortion.

In theory, the AOC could promulgate less burdensome procedures for obtaining a waiver. However, with any procedure, problems will arise. Video-conferencing, suggested by Justice O'Hern in his dissent, *post* at 651, 762 *A.*2d at 643, is not generally accessible and may be cost prohibitive. Tele-conferencing could create due process concerns arising from the form and extent of the proceeding, particularly when the minor's testimony—and credibility—is important. Representation by an attorney may be critical and is provided by the statute. *N.J.S.A.* 9:17A–1.7(b). We understand that lists of attorney volunteers have been compiled, but even so, attorneys must be contacted in each case and some may not be immediately available. *See AOC Directive No. 10–99* § II(D)(2) (Sept. 8, 1999). Moreover, the attorney must schedule a consultation with his or her client, even when that consultation is to take place by telephone. Legal representation takes time that can only be shortened so much if counsel is to be adequately prepared with "clear and convincing evidence" to support the young woman's waiver request. *N.J.S.A.* 9:17A–1.7(d). Indeed, the appointment of a guardian *ad litem* may be needed "to protect the minor's best interests." *Id.* § II(E). Finally, the right to appeal to our intermediate courts is constitutionally based, *N.J. Const.* art. VI, § 5, ¶ 2, and also takes time. The dissent notwithstanding, few if any of those requirements can be further truncated.

Justice O'Hern further argues that it is "somewhat facile" to complain about burdens and delays created by the judicial bypass process when young women seeking an abortion without parental notification now travel to a physician and exchange telephone calls with medical personnel. *Post* at 651, 762 *A*.2d at 643. Although it is irrefutable that burdens and delays already exist in a minor's pursuit of an abortion, we are concerned only with those burdens that are created by state action. In any case, additional impediments added to existing impediments may well prevent the exercise of a fundamental right altogether. That would be unacceptable without substantial adequate justification for the classification created by the Legislature.

The State alleges as justification that the Act protects minors from their own immaturity, fosters and preserves the family structure, and protects parents' rights to raise their children in a manner they deem appropriate. We address each claim in turn and conclude that the values asserted by the State are not advanced by the Notification Act.

We observe first that the State has recognized a minor's maturity in matters relating to her sexuality, reproductive decisions, substance-abuse treatment, and placing her children for adoption. *N.J.S.A.* 9:17A–1; *N.J.S.A.* 9:17A–4; *N.J.S.A.* 9:2–16. One physician informs us that because young woman have immature skeletal development and inadequate pelvic growth, delivery through a cesarean section is more often necessary than is the case with somewhat older women. Cesarean sections are major surgical procedures and are more dangerous than normal delivery. Yet, the State does not require notification of a cesarean section; only the considerably less difficult abortion procedure is burdened in the name of protecting minors. Moreover, the State also claims that parents provide information about a minor's health otherwise not available. We cannot conceive of a better time than before a major operation such as a cesarean section for a doctor to be fully knowledgeable about a patient's health status. The State's differential treatment is therefore difficult to justify.

The certifications in the record set forth the health care professionals' collective opinion that minors are quite capable of making informed, thoughtful decisions about the risks of and the reasons for both abortion and childbirth. Those professionals state that minors recognize their own immaturity and financial inability in respect of raising children, demonstrate their maturity in the first instance by actually locating an appropriate family-planning facility, and are quite capable of providing satisfactory informed consent. Indeed, the American Academy of Pediatrics points to research indicating that "most minors 14 to 17 years of age are as competent as adults [are] to provide consent to abortion...."

As for the alleged mental-health risks to young women who choose an abortion, plaintiffs' certifications further indicate that those young women do not suffer greater psychological problems than the young women who carry their pregnancies to term. In the view of one physician, a minor will be in a better mental state after an abortion if *she* decided whether to involve or exclude others in her choice, as opposed to state-mandated parental involvement. The State offers no evidence that choosing to have an abortion without notifying a parent poses any greater mental-health risk to a minor than choosing to bear a child without parental notification.

The Minnesota judge mentioned earlier as having had experience with his state's bypass procedures indicates that he granted all but one of approximately six hundred petitions seeking to avoid notification. That judge has found that, as a group, the young women who appear before him are sufficiently mature and capable of providing informed consent. The Massachusetts experience is even more telling. There, out of about 15,000 cases, only thirteen resulted in a denial, and eleven of those denials were reversed on appeal. Those numbers compellingly suggest that New Jersey's waiver procedure serves only to delay abortions, and raises the question whether the Notification Act furthers the expressed state interests.

The State also asserts that the Notification Act was passed to facilitate and foster familial communications. The reality is that the Act applies to many young women who are justified in not notifying a parent about their abortion decisions. Their reasons include abusive home environments and parental inadequacy, and their plight is described by the American Medical Association's (AMA) Council on Ethical and Judicial Affairs.[10] *Mandatory Parental Consent to Abortion*, 269 *JAMA* 82 (1993). The Council observes that, for most children, the home is a place of caring, love, and support. *Id.* at 83. Yet, the report also states that "[f]or some ... the home falls far short of this ideal and may be a place of physical abuse and neglect and psychological mistreatment." *Ibid.* Mandated disclosure to a parent "may ... cause serious emotional harm to the minor" and "often precipitates a family crisis, characterized by severe parental anger and rejection of the minor." *Ibid.* For those reasons, the AMA has recognized the need for and currently supports "confidential care for adolescents as essential to their use of health services." *Ibid.*

A recurring theme in the record is that a law mandating parental notification prior to an abortion can neither mend nor create lines of communication between parent and child. Instead, it is the parties' pre-existing relationship that determines whether a young woman involves a parent in the difficult decision whether to seek an abortion. In fact, we have been presented with information that parents in states both with and without mandatory parental notification laws generally were comparably informed about their children's childbearing decisions. The record amply supports plaintiffs' contention that the Notification Act cannot transform a household with poor lines of communication into a paradigm of the perfect American family. Certainly, "[t]he State has no more interest in requiring all family members to talk with

---

[10] Although the AMA is not a party to this litigation and did not itself make this submission, we take judicial notice of the cited article pursuant to *N.J.R.E.* 201(b)(3). The AMA is a widely respected 153–year–old society of American physicians and has no direct interest in the outcome of this litigation.

one another than it has in requiring certain of them to live together." *Hodgson, supra,* 497 *U.S.* at 452, 110 *S.Ct.* at 2946, 111 *L.Ed.*2d at 371 (discussing *Moore v. City of E. Cleveland,* 431 *U.S.* 494, 498, 97 *S.Ct.* 1932, 1935, 52 *L.Ed.*2d 531, 537 (1977)).

Most important, as noted earlier, abortion providers already encourage minors to consult with their parents or another adult figure. A 1996 statement of position formulated by the Committee on Adolescence, American Academy of Pediatrics, explains:

The American Medical Association, the Society for Adolescent Medicine, the American Public Health Association, the American College of Obstetricians and Gynecologists, the AAP, and other health professional organizations have reached a consensus that minors should not be compelled or required to involve their parents in their decisions to obtain abortions, although they should be encouraged to discuss their pregnancies with their parents and other responsible adults. These conclusions result from objective analyses of current data, which indicate that legislation mandating parental involvement does not achieve the intended benefit of promoting family communication but does increase the risk of harm to the adolescent by delaying access to appropriate medical care.

[*The Adolescent's Right to Confidential Care When Considering Abortion,* 97 Pediatrics 746 (1996) (citations omitted).]

We are also informed that the younger the minor, the more likely it is that she will notify and seek guidance from an adult in her life. In fact, ninety percent of minors under age fifteen notify at least one parent about their intent to obtain an abortion. Those numbers suggest that the Notification Act places burdens on minors in furtherance of a goal that is illusory for some families and unnecessary for many others.

Finally, the State contends that the Act protects the right of parents to direct the care and custody of their children. *See N.J.S.A.* 9:17A–1.2. We do not dispute the right of parents to raise their children with limited government interference as described in cases decided by the United States Supreme Court such as, *Wisconsin v. Yoder,* 406 *U.S.* 205, 219, 92 *S.Ct.* 1526, 1534, 32 *L.Ed.*2d 15, 27 (1972); *Pierce v. Society of Sisters,* 268 *U.S.* 510, 534–35, 45 *S.Ct.* 571, 573, 69 *L.Ed.* 1070, 1078 (1925); and *Meyer v. Nebraska,* 262 *U.S.* 390, 399–400, 43 *S.Ct.* 625, 626–27, 67 *L.Ed.* 1042, 1045–46 (1923). Here, however, minors wish to exercise a

fundamental right independent of parental involvement. As one commentator has observed:

> Taken together, the Supreme Court decisions [referenced above] stand for the proposition that the State may not interfere with a parent's upbringing of a child, but they say nothing about a parent's right to prevent or even be informed about a child's exercise of her own constitutionally protected rights.
>
> [Catherine Grevers Schmidt, *Where Privacy Fails: Equal Protection and the Abortion Rights of Minors,* 68 *N.Y.U. L.Rev.* 597, 630 (1993).]

The evidence presented in plaintiffs' certifications leads inexorably to the conclusion that the proffered statutory reasons for requiring parental notification are not furthered by the statute. Justice Blackmun found similarly in his *Akron II* dissent, wherein he stated that "the state has failed utterly to show that it has any significant state interest in deliberately placing its pattern of obstacles in the path of the pregnant minor seeking to exercise her constitutional right to terminate a pregnancy. The challenged provisions of the ... statute are merely 'poorly disguised elements of discouragement for the abortion decision.' " 497 *U.S.* at 525–526, 110 *S.Ct.* at 2985, 111 *L.Ed.*2d at 428 (Blackmun, J., dissenting).

### V

Article I, paragraph 1, of the New Jersey Constitution does not permit the State to impose disparate and unjustifiable burdens on different classes of young women when fundamental constitutional rights hang in the balance. The State has failed to demonstrate a substantial need for the Parental Notification for Abortion Act, or even that the asserted need is capable of realization through enforcement of the Act's provisions. Nor does the State offer adequate justification for distinguishing between minors seeking an abortion and minors seeking medical and surgical care relating to their pregnancies. To the contrary, plaintiffs present compelling evidence that neither the interests of parents nor the interests of minors are advanced by the Notification Act, and further that there is no principled basis for imposing special burdens only on that class of minors seeking an abortion.

Accordingly, we hold that the State's interest in enforcing the statutory classification fails to override the substantial intrusions it imposes on a young woman's fundamental right to an abortion and is unconstitutional under the equal protection principles set forth in our State Constitution.[11]

The judgment of the Superior Court, Chancery Division, is reversed.

O'HERN, J., dissenting.

By casting this statute as one that strikes at "the fundamental right of a woman to control her body and destiny," *ante* at 612, 762 *A*.2d at 621, the Court finds the uncomplicated act of parental notification or waiver thereof to create an undue burden on reproductive rights. The Court's language gives a misleading impression that the statute unduly regulates or forbids the abortion procedure itself. The statute does not. By characterizing the issue in such broad terms, the Court has forsaken traditional constitutional analysis. As Justice Breyer recently observed in *Stenberg v. Carhart:*

> We understand the controversial nature of the problem. Millions of Americans believe that life begins at conception and consequently that an abortion is akin to causing the death of an innocent child; they recoil at the thought of a law that would permit it. Other millions fear that a law that forbids abortion would condemn many American women to lives that lack dignity, depriving them of equal liberty and leading those with least resources to undergo illegal abortions with the attendant risks of death and suffering. Taking account of these virtually irreconcilable points of view, aware that constitutional law must govern a society whose different members sincerely hold directly opposing views ... [is a considerable task.]

> [530 *U.S.* 914, ——, 120 *S.Ct.* 2597, 147 L.Ed.2d 743..]

Yet, "[t]o declare a statute unconstitutional is a judicial power to be delicately exercised." *Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381, 388, 153 *A*.2d 10 (1959)(*quoting Wilentz v. Hendrickson*, 133 *N.J. Eq.* 447, 487, 33 *A*.2d 366 (Ch.1943)). A

---

[11] Having declared the Notification Act unconstitutional under equal protection principles, we do not reach plaintiffs' due process argument.

legislative act should not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). Although the Court has declared unconstitutional the State's Parental Notification for Abortion Act, I dissent because the repugnancy of the law to the Constitution of the State of New Jersey is not clear beyond a reasonable doubt.

## I.

In reviewing a similar legislative pattern, the United States Supreme Court has held that there is no federal constitutional impediment to the law. Initially, the Court had struck down state laws requiring parental consent and notification before a pregnant minor may have an abortion. In *Planned Parenthood of Central Missouri v. Danforth,* 428 *U.S.* 52, 96 *S.Ct.* 2831, 49 *L.Ed.*2d 788 (1976), the Court's first ruling on the issue, a one-parent consent requirement was held unconstitutional. The Court held that a state might not impose this type of "blanket provision" because the statute gave a third party a veto over the abortion decision. *Id.* at 74, 96 *S.Ct.* 2831. On the same day, however, the Court handed down its initial holding in *Bellotti v. Baird,* 428 *U.S.* 132, 96 *S.Ct.* 2857, 49 *L.Ed.*2d 844 (1976). *Bellotti* explained that "a statute that prefers parental consultation and consent, but that permits a mature minor capable of giving informed consent to obtain, without undue burden, an order permitting the abortion without parental consultation" would be fundamentally different from a statute that creates a "parental veto." *Id.* at 145, 96 *S.Ct.* 2857. In *Bellotti II,* the Court explained that a parental consent requirement accompanied by an alternative procedure that permits a pregnant minor to bypass her parents' involvement would pass muster: "[E]very minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents." 443 *U.S.* 622, 647, 99 *S.Ct.* 3035, 3050, 61 *L.Ed.*2d 797 (1979). In *H.L. v. Matheson,* 450 *U.S.* 398, 408–09, 101 *S.Ct.* 1164, 1171, 67 *L.Ed.*2d 388 (1981), concerning a Utah

statute requiring parental notification, the Court again expressed its view that a valid bypass option must accompany parental involvement requirements.

Three later cases illustrate that the Court's acceptance of parental consent and notification requirements rests on the availability of an effective judicial bypass option. In *Hodgson v. Minnesota*, 497 *U.S.* 417, 423, 110 *S.Ct.* 2926, 2931, 111 *L.Ed.2d* 344, 353 (1990), the Court held that Minnesota's two-parent notification requirement, without the option of judicial bypass, was unconstitutional. However, a different majority of the Court also held that the law's judicial bypass option was constitutional. *Id.* at 423, 110 *S.Ct.* 2926. On the same day, the Court ruled in *Ohio v. Akron Center for Reproductive Health*, 497 *U.S.* 502, 506–07, 110 *S.Ct.* 2972, 2977, 111 *L.Ed.2d* 405, 416 (1990), that an Ohio statute that prohibited the performance of an abortion on a minor without the consent of a parent or a judicial bypass was constitutional. Finally, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 *U.S.* 833, 899, 112 *S.Ct.* 2791, 2832, 120 *L.Ed.2d* 674 (1992), the Court found Pennsylvania's parental consent requirement with its judicial bypass alternative to be constitutional. The Court summarized its reasoning in *Planned Parenthood v. Casey,* stating that the woman's right to seek an abortion, while constitutionally protected, is not absolute. "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.* at 874, 112 *S.Ct.* 2791.

Finally, in *Lambert v. Wicklund*, 520 *U.S.* 292, 117 *S.Ct.* 1169, 137 *L.Ed.2d* 464 (1997), the Court approved a notification statute much like the New Jersey Act. The Minnesota statute prohibited a physician from performing an abortion on a minor unless the physician had notified one of the minor's parents or the minor's legal guardian forty-eight hours in advance. *Id.* at 293, 117 *S.Ct.* 1169. The statute, like the New Jersey law, also provided for a judicial bypass procedure under which a court could waive the

notification requirement if certain statutory criteria, similar to New Jersey's Act, were met. *Id.* at 293–94, 117 *S.Ct.* 1169.

The Court held that this statute, providing a judicial bypass procedure that is indistinguishable from New Jersey's, passed constitutional muster. *Id.* at 299, 117 *S.Ct.* 1169. The Court found that result to be fully consistent with its previous decisions in *Bellotti, supra,* and *Akron Center, supra. Id.* at 295–98, 117 *S.Ct.* 1169. From those decisions, we derive the principle that only state regulations that place an undue burden on a woman's right to seek an abortion are unconstitutional. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Planned Parenthood v. Casey, supra,* 505 *U.S.* at 877, 112 *S.Ct.* 2791. Such a burden would be imposed on minors, the Court has held, should parental involvement requirements fail to include a bypass alternative of the sort elaborated in *Bellotti II, supra,* 443 *U.S.* at 647–48, 99 *S.Ct.* 3035.

## II.

Acting pursuant to the guidance provided by the United States Supreme Court, the New Jersey Legislature has crafted a law that fully complies with constitutional requirements. It has provided for one-parent notification with a speedy judicial bypass option. A judge considering such a request must make a determination within forty-eight hours or the application will be deemed to be granted. An expedited and confidential appeal is available. No filing fees are required. Every effort has been made to facilitate the implementation of the Act. On September 8, 1999, the Administrative Director of the Courts issued Directive No. 10–99 to all Superior Court judges, setting forth specific and detailed procedures for implementation of the Act. If there is any problem with those procedures, the Court should correct its procedures rather than to invalidate the law. The trial court found that New Jersey's law provided even more protections than the *Lambert*

statute by, for example, providing for a faster resolution of the appeal process through immediate mail notice and by permitting a minor's guardian, rather than a parent, to be notified in appropriate cases. 1999 *WL* 1138605, *15–16 (N.J.Super.Ch. Div.). The Chancery Division upheld the law in all respects.

## III.

### A.

Because the law is plainly constitutional under federal law, the only question is whether it violates the New Jersey Constitution. Rather than to reinvent the analysis, we shall simply restate Justice Pollock's exposition of the principles governing the constitutionality of state legislation that is set forth in *Greenberg v. Kimmelman*, 99 *N.J.* 552, 494 *A.*2d 294 (1985).

> Throughout [the 20th] century, the United States Supreme Court has alternately resorted to the due process and the equal protection clauses of the fourteenth amendment to invalidate various forms of state legislation. Although both clauses are available as a means of protecting against unjustified state regulation of individual rights, they protect against different evils. When a court invalidates a statute on due process grounds, the court is saying, in effect, that the statute seeks to promote the state interest by impermissible means. In contrast, when a court declares a statute invalid on equal protection grounds, it is not saying that the legislative means are forbidden, but that the Legislature must write evenhandedly.
>
> [*Id.* at 562, 494 *A.*2d 294 (citations omitted).]

Justice Pollock explained: "Insofar as most rights are concerned, a state statute does not violate [federal] substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." *Id.* at 563, 494 *A.*2d 294. Constitutional analysis concerning "fundamental rights" demands "a more exacting ... standard," while equal protection analysis "traditionally involves different tiers or levels of review." *Id.* at 564, 494 *A.*2d 294.

This Court has generally eschewed a multi-tiered approach to constitutional analysis. Such an analysis weaves "a veil of tiers which shrouds [the] essential issue." *Matthews v. Atlantic City,*

84 *N.J.* 153, 175, 417 *A.*2d 1011 (1980)(Clifford, J., dissenting). We simply balance the interests at hand.

> The analysis of fundamental rights under the New Jersey Constitution differs from analysis of those rights under the United States Constitution. *Right to Choose v. Byrne,* 91 *N.J.* 287, 308–09 [450 *A.*2d 925] (1982). Starting with our decision in *Robinson v. Cahill,* 62 *N.J.* 473, 491–92, 303 *A.*2d 273, (1973), we began to develop an independent analysis of rights under article 1, paragraph 1. Thereafter, we rejected two-tiered equal protection analysis, *Collingswood v. Ringgold,* 66 *N.J.* 350, 370 [331 *A.*2d 262 (1975)], and employed a balancing test in analyzing claims under the state constitution. *Taxpayers Ass'n of Weymouth Township v. Weymouth Township,* 80 *N.J.* 6, 43 [364 *A.*2d 1016] (1976). In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 308–09 [450 *A.*2d 925]; *Robinson v. Cahill, supra,* 62 *N.J.* at 491–92 [303 *A.*2d 273].

> . . .

> Our development of an independent analysis follows basically from our recognition that the two constitutions contain different texts. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 300–01 [450 *A.*2d 925]; *see also State v. Hunt,* 91 *N.J.* 338, 364 [450 *A.*2d 952] (1982) (Handler, J., concurring) (identifying textual language as the first of seven criteria for determining when to invoke state constitution as an independent source of fundamental rights). From the face of the two charters, it is apparent that the New Jersey .Constitution is not a mirror image of the United States Constitution. Article 1, paragraph 1 of the New Jersey Constitution, which is a grant of fundamental rights, provides:

>> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

> Nowhere in that paragraph do the phrases "equal protection" or "due process" appear. Nonetheless, article 1, paragraph 1, like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike. To this extent, article 1 safeguards values like those encompassed by the principles of due process and equal protection.

> In the future, as in the past, we shall continue to look to both the federal courts and other state courts for assistance in constitutional analysis. The ultimate responsibility for interpreting the New Jersey Constitution, however, is ours.
>
> [*Greenberg, supra,* 99 *N.J.* at 567–68, 494 *A.*2d 294.]

## B.

Applying its flexible balancing test, the Court concluded in *Right to Choose v. Byrne, supra,* 91 *N.J.* 287, 450 *A.*2d 925, that a

provision in a state's Medicaid program that restricted Medicaid funds for abortion was invalid under article 1, paragraph 1 of the New Jersey State Constitution. *Id.* at 293, 450 *A.*2d 925. This provision, the Court found, protected both the individual's right to privacy and a guarantee of equal protection. Applying the "balancing test in analyzing equal protection claims under the State Constitution," the Court concluded that the statute had to be construed to permit funding of medically necessary abortions to poor women. *Id.* at 309–10, 450 *A.*2d 925. The Court found that the State's interest in protecting potential life represented legitimate state interests but that it did not outweigh the superior interest in the life and health of the mother. *Id.* at 310, 450 *A.*2d 925. Significantly, however, the Court concluded that the balance came out differently in the case of elective, non-therapeutic abortions, the same type of procedures that are covered by the Parental Notification Act. *Ibid.* Concerning non-therapeutic abortions, the Court specifically held that no similar right to privacy or equal protection violation outweighed in significance the State's determination not to fund those abortions. *Ibid.*

## C.

To repeat, the standard requires a balancing of "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg v. Kimmelman, supra,* 99 *N.J.* at 567, 494 *A.*2d 294 (citing *Right to Choose v. Byrne, supra,* 91 *N.J.* at 308–09, 450 *A.*2d 925; *Robinson v. Cahill, supra,* 62 *N.J.* at 491–92, 303 *A.*2d 273). Each of those factors was carefully considered by the Legislature when drafting the Act. Concerning the nature of the affected right, we have no doubt of the importance. Concerning the public need for the restriction, the Parental Notification Act expressly enumerates the

compelling and important State interests in protecting minors against their own immaturity, in fostering the family structure and preserving it as a viable social unit, and in protecting the rights of parents to rear their children.

> The Legislature further finds that minors often lack the ability to make fully informed choices that take into account both immediate and long-range consequences of their actions; that the medical, emotional, and psychological consequences of abortion are serious and of indeterminate duration, particularly when the patient is a minor; that parents ordinarily possess information essential to a physician's exercise of his best medical judgment concerning their child; and that parents who are aware that their minor daughter has had an abortion may better insure that the minor receives adequate medical attention after her abortion. The Legislature further finds that parental consultation regarding abortion is desirable and in the best interests of the minor.
>
> [*N.J.S.A.* 9:17A–1.2]

The State interests listed here are supported by this Court's numerous decisions protecting the rights of minors and preserving the family structure. *See In re Grady*, 85 *N.J.* 235, 264, 426 *A.*2d 467 (1981) (advising child in decisions concerning reproduction); *In re Adoption of Children by L.A.S.*, 134 *N.J.* 127, 132, 631 *A.*2d 928 (1993)(describing parents' fundamental rights); *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986)(emphasizing "inviolability of the family unit"); *In re Guardianship of J.C.*, 129 *N.J.* 1, 7, 608 *A.*2d 1312 (1992)(stating that the law governing New Jersey's Division of Youth and Family Services "clearly favors keeping children with their natural parents and resolving care and custody problems within the family").

Perhaps the strongest public policy support for parental notification can be found in *N.J.S.A.* 9:17A–5, a law that has been in effect since 1968:

> Upon the advice and direction of a treating physician or, if more than one, any one of them, a member of the medical staff of a hospital, public clinic, or physician licensed to practice medicine, may, but shall not be obligated to, inform the spouse, parent, custodian or guardian of any such minor as to the treatment given or needed, and such information may be given to, or withheld from the spouse, parent, custodian or guardian without the consent of the minor patient and even over the express refusal of the minor patient to the providing of such information.

Our final consideration is the extent of the restriction. The law is at once criticized because it does too little and criticized because it does too much. Those opposed to the law argue that it is ineffective and therefore unnecessary. *See Planned Parenthood of Central New Jersey v. Farmer, supra*, 1999 WL 1138605 at *11

("About ninety-eight percent of the [judicial] bypasses are granted on findings that the minor is mature enough to consent to her own abortion.") How then can it be persuasively stated that the law will be an undue burden on a young woman's reproductive rights?

The Court reasons that the Act places an undue burden on minors seeking an abortion in part because of the need for the child to play "truant" and the burdensome necessity to make phone calls to courts and lawyers. *Ante* at 636, 762 *A*.2d at 635. Yet, the Act does not require actual presence of the minor in a court room before a Superior Court judge. Procedures, such as video-conferencing, even after-school hours, could be made available to the minor. Presumably, the minor has traveled to a physician and exchanged telephone calls with nurses or medical assistants who have affirmed the minor's pregnancy without her parents' involvement. It seems somewhat facile to claim that the judicial bypass creates a greater burden on young women than the effort involved in seeking the abortion itself without her parents' knowledge.

## IV.

On the merits, I disagree with the Court's equal protection analysis. "Absent infringement of a fundamental right or discrimination against a suspect class, equal protection is not denied if the legislative classification is reasonable and bears a rational relationship to a legitimate government objective." *Rubin v. Glaser*, 83 *N.J.* 299, 309, 416 *A*.2d 382 (1980); *see also Chamber of Commerce of U.S. v. New Jersey*, 89 *N.J.* 131, 158, 445 *A*.2d 353 (1982)(holding that a court must determine "first whether there is a conceivable legitimate state objective and second whether the classification selected is rationally related to that objective.")

The majority concedes that we do not deal with a suspect class. "[P]urposeful discrimination is 'the condition that offends the Constitution.'" *Personnel Administrator of Massachusetts v. Feeney*, 442 *U.S.* 256, 274, 99 *S.Ct.* 2282, 2293, 60 *L.Ed.*2d 870 (1979)(*quoting Swann v. Charlotte–Mecklenburg Bd. of Ed.*, 402

*U.S.* 1, 16, 91 *S.Ct.* 1267, 1276, 28 *L.Ed.*2d 554 (1979)). "The central purpose of the Equal Protection Clause ... is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 *U.S.* 229, 239, 96 *S.Ct.* 2040, 2047, 48 *L.Ed.*2d 597 (1976). The landmark cases in equal protection have always focused upon disparate treatment of the individual. The equal protection clause directs that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 *U.S.* 412, 415, 40 *S.Ct.* 560, 562, 64 *L.Ed.* 989 (1920). But so too, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe,* 457 *U.S.* 202, 216, 102 *S.Ct.* 2382, 2394, 72 *L.Ed.*2d 786 (1982).

The subject of the notification, pursuant to the Parental Notification Law, is not the person or the child involved but the nature of the medical procedure involved. There is no disguised attempt to single out a class. *Yick Wo v. Hopkins,* 118 *U.S.* 356, 6 *S.Ct.* 1064, 30 *L.Ed.* 220 (1886).

Concerning the infringement of fundamental right, the essence of the right—the right to choose the procedure—has not been substantially interfered with.

The question is whether the classification is reasonable and bears a rational relationship to a legitimate governmental objective. In the last analysis, the question comes down to whether it is irrational to distinguish between choosing to carry a child to term and choosing to terminate a pregnancy.

I cannot say that such a classification is irrational. Common experience tells us that in most circumstances most parents will learn when their daughter is carrying a child to term and will be able to counsel the child concerning the proper medical procedure. That is not at all the same as knowing whether a daughter has elected not to carry a child to term. In the District Court opinion in *Hodgson,* the Court observed that "the Supreme Court has rejected challenges to abortion statutes in other contexts based on different treatment between abortions and other medical deci-

sions. *See, e.g., Matheson, supra,* 450 *U.S.* at 412–13, 101 *S.Ct.* 1164 (parental notice); *Harris v. McRae,* 448 *U.S.* 297, 325, 100 *S.Ct.* 2671, 65 *L.Ed.*2d 784 (1980) (abortion funding); *see also American College of Obstetricians and Gynecologists v. Thornburgh,* 737 *F.*2d 283, 296 (3d Cir.1984) (rejecting equal protection challenge to Pennsylvania parental consent/judicial bypass statute)." *Hodgson v. Minnesota,* 1985 WL 6547, *6 (D.Minn.1985). The Court of Appeals reasoned to the same effect on the basis of the same authorities.

> The *Hodgson* group contends that the district court erred in holding that the statute does not violate the equal protection clause. First, they argue that the statute deprives minors who choose abortion of equal protection of the law because it singles out abortion as the only pregnancy-related medical procedure requiring third-party notification and because the statute impermissibly discriminates between those minors who are able to notify both their parents and those who cannot. The *Hodgson* group failed to raise the latter challenge at trial, and therefore we need not address it here. *Stafford v. Ford Motor Co.,* 790 *F.*2d 702, 706 (8th Cir.1986). As to the first issue, a similar challenge was rejected by the Court in *Matheson,* 450 *U.S.* at 412–13, 101 *S.Ct.* at 1172–73, and the Court has rejected challenges to abortion statutes based on different treatment in other contexts. *Harris v. McRae,* 448 *U.S.* 297, 325, 100 *S.Ct.* 2671, 2692, 65 *L.Ed.*2d 784 (1980) (abortion funding); *Maher v. Roe,* 432 *U.S.* 464, 469–71, 97 *S.Ct.* 2376, 2380–81, 53 *L.Ed.*2d 484 (1977) (abortion funding); *Danforth,* 428 *U.S.* at 66–67, 96 *S.Ct.* at 2839–40 (written consent to abortion). Moreover, as discussed in Part I, supra, a state may regulate a minor's exercise of her constitutional rights in a manner that would not be permissible in the case of an adult. *Akron,* 462 *U.S.* at 427 n. 10, 103 *S.Ct.* at 2491 n. 10. Based on the interests discussed, states may rationally conclude that the decision to have an abortion poses risks to the physical, mental or emotional well-being of minors which are greater than those associated with other health care services. *Bellotti II,* 443 *U.S.* at 640–41, 648–49, 99 *S.Ct.* at 3046–47, 3050–51 (plurality). "If the pregnant girl elects to carry her child to term, the medical decisions to be made entail few—perhaps none—of the potentially grave emotional and psychological consequences of the decision to abort." *Matheson,* 450 *U.S.* at 412–13, 101 *S.Ct.* at 1172–73. Thus, we cannot say the district court erred in concluding the statute does not violate the equal protection clause.
>
> [*Hodgson v. Minnesota,* 853 *F.*2d 1452, 1466 (8 th Cir.1988).]

## V.

To sum up, the Legislature has passed a statute asking that before performing an abortion on a minor, either the physician notify a parent or a waiver of that notification requirement be obtained "from a judge of the Superior Court." *N.J.S.A.*

9:17A–1.7a. Except specifically to waive any filing fees, the Legislature left it to the Superior Court to establish the procedures to accomplish the simple goal of providing "[a]ccess to the trial court." *N.J.S.A.* 9:17A–1.7f. In what can best be seen as a "self-fulfilling prophecy," *Oregon v. Elstad,* 470 *U.S.* 298, 359, 105 *S.Ct.* 1285, 1319, 84 *L.Ed.*2d 222 (1985)(Brennan, J., dissenting.), the Administrative Office of the Courts established the procedures for a judicial bypass that the Court now perceives as creating an undue burden on a minor. Rather than to cure any defect in the procedures as the Court has done in the past, *Doe v. Poritz,* 142 *N.J.* 1, 662 *A.*2d 367 (1995), the Court has declared the Act unconstitutional. If there is any fault within the law, the fault lies within ourselves for having made a simple process more cumbersome than it need be.

The State's Parental Notification Act does not offend due process under the State Constitution because there need be only a minimal governmental restriction on the exercise of the child's reproductive rights. That minimal interference is well justified by the State's long-standing commitment to the health and welfare of children and its corresponding obligation to respect the right of parents to direct the upbringing of their children.

In its most recent pronouncement on the rights of parents, the Supreme Court has stated:

> The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska,* 262 *U.S.* 390, 399, 401, 43 *S.Ct.* 625, 67 *L.Ed.* 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children". . .
>
> . . .
>
> *See, e.g.,* . . . *Wisconsin v. Yoder,* 406 *U.S.* 205, 232, 92 *S.Ct.* 1526, 32 *L.Ed.*2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); . . . In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Four-

teenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

[*Troxel v. Granville*, 530 *U.S.* 57, ——, 120 *S.Ct.* 2054, 147 *L.Ed.*2d 49 (U.S.Wash. 2000).]

The Act does not offend equal protection requirements because it involves a reasonable classification of different medical procedures. It does not create a suspect class of women. In *Right to Choose v. Byrne, supra,* Justice Pollock explained that "the State may pursue its interest in potential life by excluding [non-therapeutic] abortions from the Medicaid program." 91 *N.J.* at 309, 450 *A.*2d 925. For purposes of equal protection analysis there is a vast difference between the minor's decision to abort her pregnancy, which this Court has already concluded implicates a "potential life" and her decision to carry to term.

I would affirm the judgment of the Chancery Division upholding the constitutionality of the Act. I would require the Administrative Office of the Courts to modify the procedures currently in place to minimize any unnecessary burdens in the constitutionally required bypass procedure.

Justice VERNIERO joins in this opinion.

VERNIERO, J., dissenting.

I will not repeat the careful analysis set forth in Justice O'Hern's dissenting opinion, which I join. I write separately only to add the following.

If the statute infringed on the reproductive rights of women to any significant degree, I would join the majority. However, I do not share the Court's characterization of the statute. I view the statute by its plain terms as one that does not unduly regulate or forbid any form of abortion procedure.

In that regard, the statute in this case is markedly different from the law at issue in *Planned Parenthood of Central New Jersey v. Verniero*, 41 *F.Supp.*2d 478 (D.N.J.1998), *aff'd sub nom. Planned Parenthood of Central New Jersey v. Farmer*, 220 *F.*3d 127 (3d Cir.2000). In that case, the United States District Court

held that New Jersey's law prohibiting the "partial-birth abortion" procedure was impermissibly vague, was an undue burden on reproductive rights, and did not adequately protect the mother's health. *Id.* at 496, 499, 502. In contrast, the notification statute does not significantly encumber a physician's ability to advise and treat patients according to their needs. When measured against the right of parents to be informed of significant health issues affecting their minor children, the law is sustainable. Stated differently, the statute accommodates the rights of both young women and their parents within this limited context of notification.

To the extent that the judicial bypass procedures prove insufficient in practice, I would require the Administrative Office of the Courts (AOC) to redesign those procedures to assure access to the courts in a confidential setting. Unlike the majority, I cannot conclude on this record that the AOC procedures are beyond constitutional repair. I would remand the matter to enable the parties to develop a full record before taking the extraordinary step of invalidating the statute based on asserted flaws in the AOC procedures.

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN and LONG—4.

*For affirmance*—Justice O'HERN—1.

*For affirmance and remandment*—Justice VERNIERO—1.